LAW OFFICES
MORGAN, LEWIS & BOCKIUS LLP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 309–6000


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

KHALED MOHAMED,

                      Plaintiff,                06 Civ. 1504 (BSJ) (DFE)

       -against-                     **ELECTRONICALLY FILED**

SANOFI-AVENTIS PHARMACEUTICALS;
SANOFI-SYNTHELABO GROUP SEPARATION
PAY PLAN and SANOFI-SYNTHELABO
SEPARATION PAY PLAN COMMITTEE,

                     Defendants

----------------------------------------------------------------X

## DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS

       Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 56.1 for the

United States District Court for the Southern District of New York, and the individual rules of

this Court, Defendants sanofi-aventis U.S. Inc. ("sanofi-aventis" or the "Company"), Sanofi-

Synthelabo Group Separation Pay Plan (the "Plan") and Sanofi-Synthelabo Group Separation

Pay Plan Committee (the "Committee") (collectively, "Defendants"), by and through their

attorneys, Morgan, Lewis & Bockius LLP, respectfully submit this Statement Of Material

Undisputed Facts in support of their Motion for Summary Judgment.


**A.**      **PLAINTIFF'S EMPLOYMENT WITH THE COMPANY**

       1.       Sanofi-aventis is a global pharmaceutical company engaged in the research,

development, manufacture and marketing of healthcare products.  See Am. Compl. ¶ 6; Ans. ¶ 6.

In approximately July of 1997, Plaintiff joined the Company's predecessor, Sanofi-Synthelabo, Inc., as a Network Technologist, working at the Company's North American corporate headquarters at 90 Park Avenue, New York.  In approximately February of 1998, Plaintiff's job title changed to Lead Network Technologist.  In approximately August of 2002, Plaintiff was promoted to Associate Director of Network Services.  Plaintiff held this position until January 27, 2005, when his employment was terminated.  See Deposition of Khaled Mohamed taken August 10, 2006 ("Pl. Dep.") at 18-20, 101-03 (Exhibit 1).[1]

2.      As Associate Director, Plaintiff reported to Neil Kalan, the Director of Network Services.  Mr. Kalan reported to Rick Van Akin, the Senior Director, who, in turn, reported to Kevin O'Rourke, the Chief Information Officer.  The Network Services Department (sometimes also referred to as the Technology Services or IS Department) was responsible for the Company's network, server, data communication and voice communication infrastructure.  See Pl. Dep. at 21-22 (Exhibit 1); Deposition of Neil Kalan taken September 21, 2006 ("Kalan Dep.") at 30 (Exhibit 2); Deposition of Rick Van Akin taken September 22, 2006 ("Van Akin Dep.") at 18-19, 21-22 (Exhibit 3).

3.      As Associate Director in 2004, Plaintiff was responsible for planning, provisioning, operation and maintenance of data communications networks for the Company's North American commercial operational locations.  His job duties included developing, presenting and justifying annual capital and operations budgets for communications and network services, and managing expenditures to ensure compliance with budgetary limits.  See Pl. Dep. at 27-28, 37-38 (Exhibit 1).

---

[1] The Exhibits referenced herein are included in the Appendix accompanying Defendants' Motion.

4.     Capital projects were identified, discussed and agreed upon within the Network Services Department.  Plaintiff described the process of identifying capital projects and preparing capital budgets as follows:

> Business leaders like Rick Van Akin or Kevin [O'Rourke] tell us what they are expecting to see next year.  We have a budget plan and cap.  We go through process of approval.  I wrote the project plan.  I said that's what we need for this, the company said okay, we need this project, we approve it.  Or we didn't need this project, we didn't need it, and so on.

Operations budgets were likewise discussed and agreed upon within the Network Services Department.  <u>See</u> Pl. Dep. at 29-36 (Exhibit 1).

5.     Plaintiff testified that while he was Associate Director, the Network Services Department did not exceed its capital or operations budgets.  <u>See</u> Pl. Dep. at 36 (Exhibit 1).

**B.     <u>THE COMPANY'S PROJECT PRE-APPROVAL AND PURCHASING POLICY</u>**

6.     The Company required all projects regardless of amount and all other departmental expenditures of $50,000 or more to be approved pursuant to its Project Pre-Approval and Purchasing Policy ("PPA Policy").  It was necessary to obtain approval pursuant to the PPA Policy in addition to obtaining budgetary approval.  <u>See</u> Kalan Dep. at 46-48 (Exhibit 2); PPA Policy § II.2.1 (Exhibit 4).

7.     The PPA Policy contained the following provisions:

> <u>Statement</u>
> It is the policy of the Company to provide for efficient procedures for the authorization, approval and processing of expenditures.  These procedures have been designed to safeguard the assets of the Company through inadvertent error or purposeful malfeasance and to assure the integrity and accuracy of the Company's accounting records and financial reports.
>
> *****

II.1.1.  This procedure is based on the principle of prohibiting any employee from committing the Company to third parties without first obtaining the necessary written authorizations.

II.1.2. A PPA is the document used to request authorization to commit the Company to spend an amount on a project.  Whenever required, the PPA must be completed and approved PRIOR to any external commitment.  The PPA approval is only an internal Company document and is not an authorization to commit the corporation to a supplier….

II.1.3.  All expenditures must be grouped by project.

II.1.3.1. The notion of a project is essential to proper application of the approval thresholds: a project is a single or group of expenditures aimed at meeting a need….

II.1.3.6.  It is imperative that **THE TOTAL PROJECT AMOUNT** is reported. Splitting projects into smaller segments to circumvent approval limits is strictly prohibited."

See PPA Policy at 2-3 (Exhibit 4).

8.     While Plaintiff says he never saw a written copy, he acknowledges that he was familiar with, and received training on, the PPA Policy.  He understood that the purpose of the PPA Policy was to ensure that projects are approved before expenditures were made for those projects.  See Pl. Dep. at 47-51 (Exhibit 1).

9.     Plaintiff understood that the PPA Policy requires the preparation of a project plan, including justification for the project and an estimate of the cost of the project.  Pl. Dep. at 50-51 (Exhibit 1).  The project plan is then approved by a hierarchy of managers.  If the project is approved, it receives a PPA number (sometimes also referred to as an AED).  See Pl. Dep. at 60-66 (Exhibit 1); PPA Policy at 4-5 (Exhibit 4); Kalan Dep. at 61, 63-64 (Exhibit 2).

10.     Plaintiff understood that to make a purchase in furtherance of a project, a purchase order request had to be sent to the Purchasing Department for payment.  See Pl. Dep. at 47-50 (Exhibit 1); PPA Policy §§ III.1, IV.3 (Exhibit 4).

11.     In order to be processed and paid, the purchase order request had to include a description of the purchase and a reference to the appropriate PPA number.  See Kalan Dep. at 61 (Exhibit 2).

12.     Plaintiff applied and received approval for three projects to be completed in 2004. The Cabling Fund for Infrastructure Maintenance and Upgrade project, PPA number SS04-20, had a $30,000 budget.  The Network Hardware Upgrade project, PPA number SS04-19, had a $70,000 budget.  The Server Life Cycle project, PPA number SS04-18, had a $110,000 budget. See Pl. Dep. at 54 (Exhibit 1); see also 2004 PPA Approved Projects (Exhibit 5).

13.     On March 3, 2004, Plaintiff demonstrated his understanding of the purchasing procedure for approved projects when he completed a purchase order request for the Server Life Cycle project using the correct PPA number (SS04-18).  See 3/3/04 Request for Purchase Order, Request No. 009339 (Exhibit 6).

14.     With respect to non-PPA purchases, employees were limited by their "signature authority" in completing purchase requests.  If the purchase exceeded an employee's signature authority, he/she was required to obtain additional levels of approval before submitting the purchase request.  See Kalan Dep. at 49, 197-98 (Exhibit 2).

15.     Mr. Van Akin's signature authority was $50,000, Mr. Kalan's was $25,000, and Plaintiff's was $12,500.  See Sanofi-Synthelabo Approval Authority for Rick Van Akin and Neil Kalan (Exhibit 7); Signature Authorization Profile – Approval Limits for Khaled Mohamed (Exhibit 8); Van Akin Dep. at 38 (Exhibit 3); Kalan Dep. at 49-50, 170-71 (Exhibit 2).

16.     At his deposition, Plaintiff testified that he was unaware that he had a limit to his signature authority.  See Pl. Dep. at 67-77 (Exhibit 1).

**C.     PLAINTIFF AGREES TO BE BOUND BY THE COMPANY'S TUITION REIMBURSEMENT AGREEMENT AND THE COMPANY PAYS TUITION OF $8800 ON HIS BEHALF**

17.     On May 18, 2004, Plaintiff completed and signed an application for the Company's Advanced Tuition Plan ("Tuition Agreement") in which he sought the Company's payment of tuition on his behalf to Pace University in furtherance of a doctorate in Professional Studies in Computing.  See Pl. Dep. at 200-05 (Exhibit 1); Advanced Degree Tuition Assistance Plan Financial Commitment Form (Exhibit 9).

18.     Upon the Company's approval of his application, on August 2, 2004, Plaintiff signed a "Financial Commitment Form" in which he agreed, as a condition to receiving sponsorship, that he had certain financial obligations to the Company in the event that his employment was terminated.  See Advanced Degree Tuition Assistance Plan Financial Commitment Form (Exhibit 9).

19.     Plaintiff agreed, among other things:

> If I resign or am terminated for cause from the Company within 2 years of either completing a degree program or receiving situation reimbursement for courses toward a degree in progress, I must repay the Company 100% of the tuition for all courses paid by the Company up to and including the date of termination.

See Advanced Degree Tuition Assistance Plan Financial Commitment Form (Exhibit 9); Pl. Dep. at 200-03 (Exhibit 1).

20.     Before signing the Financial Commitment Form, Plaintiff read and understood his obligations.  See Pl. Dep. at 202-03 (Exhibit 1).

21.     The Company paid Plaintiff's tuition to Pace University in the amount of $8,800. See Pl. Dep. at 204 (Exhibit 1).

**D.    IN OCTOBER OR NOVEMBER OF 2004, PLAINTIFF BECOMES AWARE OF THE PLANNED MERGER WITH AVENTIS AND THE ELIGIBILITY CRITERIA FOR SEPARATION BENEFITS**

22.    In approximately mid-2004, the Company announced its plans to merge with Aventis Pharmaceuticals Inc. ("Aventis"), a pharmaceutical company with headquarters in Bridgewater, New Jersey.  It was communicated that due to the merger, all spending towards new initiatives must cease.  See Pl. Dep. at 101-03 (Exhibit 1); Deposition of Caroline French taken September 26, 2006 ("French Dep.") at 64-66 (Exhibit 10); Affidavit of Neil Kalan dated February 8, 2007 ("Kalan Aff." ¶ 7) (Exhibit 11).

23.    Plaintiff understood that as a result of the merger, the Company's headquarters eventually would be relocated to Bridgewater.  He also understood that some positions at the Company's corporate headquarters at 90 Park Avenue would be eliminated and that the employees holding these positions might be offered positions in Bridgewater.  See Pl. Dep. at 100-03 (Exhibit 1).

24.    In October or November of 2004, Plaintiff received and reviewed the Company's Separation Policy.  See Pl. Dep. at 116-18 (Exhibit 1); Separation Policy (Exhibit 12).

25.    After reviewing the Separation Policy, Plaintiff understood that employees who were not offered a comparable position and employees who were offered a comparable position but lived more than 40 miles from the Company's new headquarters in Bridgewater, New Jersey, were eligible for separation pay benefits.  See Pl. Dep. at 118 (Exhibit 1).

26.    Plaintiff also read and understood the following provision in the Separation Policy:

**Retention Criteria**

- Separation benefits contingent upon employee continuing employment with company, in good standing, through a date determined by your manager

See Pl. Dep. at 118-19 (Exhibit 1); Separation Policy (Exhibit 12).

**E.    IN NOVEMBER OR EARLY DECEMBER OF 2004, PLAINTIFF IS OFFERED, AND REJECTS, A NEW POSITION IN BRIDGEWATER, NEW JERSEY**

27.    In late November or early December of 2004, Mr. Van Akin called Plaintiff and offered him a position as a network engineer at the Company's new headquarters in Bridgewater, New Jersey.  Plaintiff told Mr. Van Akin that he was not interested in the position and that he was pursuing a position in another division.  See Pl. Dep. at 104-06, 110-11 (Exhibit 1).

28.    A couple of days later, Mr. Van Akin approached Plaintiff in person and again offered him the New Jersey position.  Plaintiff reiterated that he was pursuing another position again rejected the position.  See Pl. Dep. at 105-06, 110-11 (Exhibit 1).

**F.    IN APPROXIMATELY THE SAME TIME FRAME, PLAINTIFF BUYS ITEMS IN EXCESS OF $50,000 WITH COMPANY FUNDS AND THEN CHANGES THE DELIVERY ADDRESS TO HIS HOME ADDRESS**

29.    From November 11, 2004 through December 1, 2004, Plaintiff completed nine (9) purchase order requests for equipment from a vendor called Network Hardware Resellers.  He then contacted the vendor to change the shipment address from the default address (i.e., the billing address at 90 Park Avenue) to his home address in Jackson Heights, New York.  See Pl. Dep. at 126-29 (Exhibit 1).

30.    Specifically, Plaintiff made the following purchases with Company funds and then had them shipped to his home:

| Invoice Number | Amount | Bates Pages |
|---|---|---|
| 65437 | $12,840.00 | D000109-112 |
| 65439 | $3,695.00 | D000096-99 |
| 65441 | $7,050.00 | D000092-95 |
| 65447 | $3,780.00 | D000084-86 |
| 65598 | $3,507.95 | D000104-105 |
| 66119 | $1,744.72 | D000106 |
| 66202 | $13,713.99 | D000087-91 |
| 66669 | $650.00 | D000107 |
| 66897 | $4,627.09 | D000081-83 |

See purchase orders and invoices (Exhibit 13); Pl. Dep. at 129-70 (Exhibit 1).

31.     Plaintiff submitted the purchase order requests for the first four purchases on the same day, November 11, 2004.  See Pl. Dep. at 171-74 (Exhibit 1).

32.     Plaintiff did not refer to any PPA number on the purchase requests.  Rather, he identified different budget expense codes on the purchase requests 3817.4970.1510 and 3817.4940-1000.  See purchase orders and invoices examples at D000082 and D000085 (Exhibit 13).

33.     Plaintiff did not ask permission to make these purchases or ship them to his home address.  See Pl. Dep. at 129-70 (Exhibit 1); Kalan Dep. at 224-25 (Exhibit 2).

**G.     PLAINTIFF IS AWARE THAT HE IS CANNOT TAKE THE COMPANY'S EQUIPMENT HOME WITHOUT FIRST ASKING PERMISSION**

34.     On December 1, 2004, Plaintiff sent an email to Mr. Kalan requesting permission to take home "two of our old switches to do some practice on them over the weekend."   Mr.

Kalan granted the request and asked Plaintiff to provide him the serial numbers for the switches

so that he could record them in the asset database.  <u>See</u> Email exchange between Kalan and

Plaintiff dated December 4, 2004 (Exhibit 14); Pl. Dep. at 96-100 (Exhibit 1).

      35.     A couple of days later, Plaintiff asked John Delibero, an employee in the Network

Services department, to purchase five wireless storage devices on the department's corporate

card and ship the items to Plaintiff's home.  <u>See</u> Pl. Dep. at 174-77 (Exhibit 1); Kalan Dep. at 25-

26, 91-95 (Exhibit 2); <u>see also</u> PC Snapper Invoice (Exhibit 15).

      36.     The department's corporate card policy limited purchases to orders under $5,000

which were not multiple orders of the same item.  When Mr. Delibero made Mr. Kalan aware of

the purchase and Plaintiff's request to ship the items to his home, Mr. Kalan raised questions

about the order.  Plaintiff then cancelled the order.  <u>See</u> Pl. Dep. at 176 (Exhibit 1); Kalan Dep. at

91-94, 87-98 (Exhibit 2).

      37.     Despite these two incidents, Plaintiff still did not disclose to Mr. Kalan that he

had made purchases with Company funds and shipped the purchases to his home.  <u>See</u> Pl. Dep. at

151-53, 178 (Exhibit 1).

**H.  WHILE ON VACATION IN EGYPT, PLAINTIFF IS GIVEN THE OPPORTUNITY TO DISCLOSE HIS PURCHASES AND YET DECLINES TO DO SO**

      38.     On or about December 2 or 3, 2004, Plaintiff took vacation to visit his brother in

Egypt.  Plaintiff planned to stay in Egypt for two weeks and work from home during the week

between Christmas and New Years Day, when the Company is officially closed.  <u>See</u> Pl. Dep. at

105-06, 127 (Exhibit 1).

39.     On December 7, 2004, when Plaintiff was in Egypt, Mr. Kalan sent an email asking why Plaintiff had spent $7000 on maintenance for hardware that was not being used at the Company, including Cisco IP phones.  Plaintiff responded,

> I collected some information about Aventis Network which is using VoIP therefore I had the idea gaining some experience and knowledge before we started working with them therefore I ordered start up Kit for VoIP.  This hardware is on order for last around three weeks.  We did not receive yet….

See Email exchange between Kalan and Plaintiff dated December 7, 2004 (Exhibit 16).

40.     Plaintiff did not disclose to Mr. Kalan that he had in fact made purchases exceeding $50,000 and had the purchases shipped to this home.  See Email exchange between Kalan and Plaintiff dated December 7, 2004 (Exhibit 16).

41.     Mr. Kalan does not recall if he followed up with Plaintiff at this time, given that Plaintiff was still on vacation overseas.  However, even if the equipment Plaintiff ordered might have been compatible with Sanofi systems or used by Aventis, the purchases were not authorized because the Network Services Department had been instructed to cease spending on all new initiatives.  There had been no decision made as to what technologies would be used once the two companies merged.  See Kalan Dep. at 160-65 (Exhibit 2); Kalan Aff. ¶ 6 (Exhibit 11).

## I.     WHILE ON VACATION IN EGYPT, PLAINTIFF IS OFFERED AND REJECTS THE NEW JERSEY JOB A THIRD TIME

42.     When Plaintiff was in Egypt, Mr. Van Akin called and informed him that his job was being eliminated as of March 31 or July 31.  Mr. Van Akin then offered him the New Jersey position a third time.  See Pl. Dep. at 122-24 (Exhibit 1).

43.     Plaintiff informed Mr. Van Akin that he still was not interested in the job.  In rejecting the position, Plaintiff understood that he would be eligible for separation benefits.  No

one ever told him that he was not eligible for separation benefits.  See Pl. Dep. at 123-25
(Exhibit 1).

44.     On or about December 14, 2004, the Company sent Plaintiff a memorandum
providing formal notice that "the 90 Park Avenue will experience as permanent workforce
reduction" and that "[i]t is expected that you will be separated from Sanofi-Synthelabo Inc. on
February 15, 2005 if you have not been offered another position with sanofi-aventis before that
date."  Plaintiff received the memorandum on January 12, 2005, after he had returned to work
from vacation.  See Pl. Dep. at 120-22, 186-87 (Exhibit 1); see also December 14, 2004
memorandum (Exhibit 17).

## J.     THE COMPANY DISCOVERS POTENTIAL PROBLEMS IN PLAINTIFF'S PURCHASES

45.     While Plaintiff was in Egypt, Mr. Kalan learned from the Purchasing Department
that purchase orders and invoices appeared to show that Plaintiff had purchased equipment and
redirected it to his home address.  See Kalan Dep. at 207-08 (Exhibit 2); Kalan Aff. ¶ 7 (Exhibit
11).

46.     Some of the items purchased had never been used by the Company.  Some of the
items were used, rather than new, even though the Company typically did not purchase used
items.  Some of the items were purchased in multiple quantities.  Plaintiff also purchased a
number of cables, even though the Company had plenty of cables in its test lab in the basement
of its corporate headquarters at 90 Park Avenue.  See Kalan Aff. ¶ 11 (Exhibit 11); Kalan Dep. at
172-75, 191-93, 195, 217 (Exhibit 2).

47.     Mr. Kalan showed the documentation to Mr. Van Akin, and they agreed to contact
Human Resources.  See Kalan Dep. at 207-08 (Exhibit 2).

48.     Mr. Kalan contacted Human Resources.  He then met with Caroline French, Human Resources Specialist, and together they reviewed the invoices.  Mr. Kalan told Ms. French that he did not have knowledge of the purchases and expressed concern that they had been shipped to Plaintiff's home.  See Kalan Dep. at 210-13 (Exhibit 2); French Dep. at 38-40 (Exhibit 10).

49.     Mr. Kalan and Ms. French decided to meet with Plaintiff upon his return from vacation in order to better understand the circumstances under which Plaintiff had made these purchases.  See Kalan Dep. at 210-13 (Exhibit 2); French Dep. at 38-40 (Exhibit 10).

50.     Ms. French regularly consulted with Kevin Dew, Associate Vice President of Human Resources Policies and Practices, throughout her investigation.  See Affidavit of Kevin Dew dated February 8, 2007 ("Dew Aff.") ¶ 7 (Exhibit 18).

## K.     THE COMPANY INTERVIEWS MOHAMED UPON HIS RETURN FROM VACATION

51.     Plaintiff returned to work on January 12, 2005 and met with Mr. Kalan and Ms. French that morning.  Ms. French provided the following sworn testimony that it was a "help-me-understand" meeting:

>     So, why are you purchasing equipment that the company does not
>     use presently?  Why are you sending it to your home?  When
>     equipment is ordered for use of the company, it's sent to the
>     company….
>
>     What was seen on paper was he ordered equipment, nobody knew
>     about it, and that it was sent to his home….. The importance of the
>     meeting with Khaled [was] to understand his side of the story
>     before we automatically took disciplinary action.
>
>     That was the purpose of the meeting, to understand from Khaled,
>     to give him an opportunity to explain himself.

See French Dep. at 52-54 (Exhibit 10).

52.     At the outset of the meeting, Mr. Kalan told Plaintiff that the Company had some concerns because there was a large quantity of computer equipment that was ordered and shipped to his home address in Jackson Heights.  Plaintiff admitted that he had done so, and informed them that he was in the process of testing and reconfiguring the equipment at home, which he had planned to do the week between Christmas and New Years' Day.  See Pl. Dep. at 179-81 (Exhibit 1); French Dep. at 47-48 (Exhibit 10).

53.     At Mr. Kalan and Ms. French's request, Plaintiff drew a picture depicting how he planned to test and reconfigure the equipment at his home.  See Pl. Dep. at 9-12, 180 (Exhibit 1); Plaintiff's drawing (Exhibit 19).

54.     It was Ms. French and Mr. Kalan's understanding that the drawing depicted a "test lab" that Plaintiff was building in his apartment that purported to connect a number of pieces of equipment together.  It seemed to Ms. French that Plaintiff contradicted himself, because he initially said that he had already built the test lab, and then he later said that he had not yet started it.  See French Dep. at 47-49 (Exhibit 10); Kalan Dep. at 223-25 (Exhibit 2).

55.     Plaintiff knew that in 2003, the Company had built a test lab in the basement of 90 Park Avenue to test and configure equipment.  The Company's test lab was specially built with the proper electricals and air conditioning to support having a large quantity of equipment up and running at the same time for configuration and testing.  See Pl. Dep. at 143-47 (Exhibit 1); Kalan Dep. at 225 (Exhibit 2).

56.     Plaintiff lives in a high-rise apartment in Jackson Heights, New York that is approximately 40 to 50 years old.  The apartment is approximately 1300 square feet and does not have central air conditioning.  See Pl. Dep. at 146-47 (Exhibit 1).

57.     Ms. French and Mr. Kalan recall that when Mr. Kalan pointed out that some of the equipment was technology not used by the Company, Plaintiff replied that he wanted to stay abreast of the latest technologies so that he would be prepared in the event that these technologies were used by the Company in the future.  See Kalan Dep. at 223-25 (Exhibit 2), French Dep. at 48-49 (Exhibit 10).

58.     Mr. Kalan told Plaintiff that as his manager, he was not aware of this test lab project.  He further pointed out that it was improper to make expenditures toward such an unapproved project without a PPA, and that it was incorrect to put the purchases toward a budget line.  See Kalan Dep. at 225 (Exhibit 2).

59.     Plaintiff said, "I use whatever the budget line I have."  See Pl. Dep. at 179-80, 182 (Exhibit 1).

60.     When asked at his deposition whether he had permission to ship the equipment to his home, Plaintiff responded: "no, I did not ask for permission."  See Pl. Dep. at 184-85 (Exhibit 1).

61.     At Ms. French's request, Plaintiff agreed to return the equipment.  See Pl. Dep. at 179 (Exhibit 1).

62.     Mr. Kalan and Ms. French informed Plaintiff that he would be sent home with pay pending their investigation into the purchases.  The meeting lasted 45 minutes to one hour.  See Pl. Dep. at 181 (Exhibit 1), French Dep. at 56-58 (Exhibit 10).

63.     At his deposition, Plaintiff claimed for the first time that these purchases were in furtherance of the Network Hardware Upgrade project.  However, the purpose of the Network Hardware Project did not include the purchase, testing, configuration and/or installation of new technologies.  Plaintiff also did not specify the PPA number for this project, SS04-19, on any of

the purchase order requests.  <u>See</u> Pl. Dep. at 129-70 (Exhibit 1); Kalan Aff. ¶ 12 (Exhibit 11);

purchase orders and invoices (Exhibit 13).

**L.      THE COMPANY CONDUCTS A THOROUGH INVESTIGATION**

64.     In order to gather facts relating to the circumstances under which Plaintiff made

his purchases, Ms. French spoke with a number of individuals, including Rick Van Akin, John

Delibero, Mark Heim, Wayne Roberts, and Noel Colberg.  <u>See</u> French Dep. at 40-42 (Exhibit

10).

65.     Mr. Van Akin, Mr. Kalan's manager, told Ms. French that it was not customary

for employees to order equipment and ship it to their homes.  He also told Ms. French that he

remembered showing Plaintiff the test lab at the 90 Park Avenue facility and making the point

that this is where testing should be done.  He indicated that regardless of an employee's signature

authority, the employee should get authorization from his manager to work on a specific project.

Finally, either he or Mr. Kalan told Ms. French that in the Summer of 2004, the Network

Services department was ordered to stop all spending in light of the upcoming merger with

Aventis.  <u>See</u> French Dep. at 64-66 (Exhibit 10); Kalan Aff. ¶ 5 (Exhibit 11).

66.     Ms. French contacted Mr. Delibero to learn more about the incident in which

Plaintiff had asked him to purchase equipment using the Company credit card and ship it to his

home.  Ms. French also spoke to Plaintiff at home and asked him for his version of this incident

<u>See</u> French Dep. at 59, 62-63, 74 (Exhibit 10).

67.     Ms. French spoke to Mr. Heim at Plaintiff's request.  Specifically, Plaintiff

claimed that Mr. Heim, his former manager, had allowed him to purchase $19,000 of equipment

and take it home.  Mr. Heim confirmed that this had occurred on one occasion, but that Plaintiff

had asked and received permission to do so.  <u>See</u> French Dep. at 96-98 (Exhibit 10).

68.     Ms. French also spoke with Wayne Roberts and Noel Colberg in the Security Department, who were conducting a parallel investigation into Plaintiff's purchases and the possibility that he was engaged in a side business.  Ms. French provided them with her notes and copies of the invoices and Federal Express confirmations of shipment.  See French Dep. at 77-82 (Exhibit 10).

69.     Ms. French determined that Plaintiff had taken sick or vacation days on the dates that some of the November 2004 shipments were delivered to his home residence.  Plaintiff confirmed that the signatures on the Federal Express shipping labels were his.  See French Dep. at 130-31 (Exhibit 10); Kalan Dep. at 220 (Exhibit 2).

70.     Plaintiff acknowledges that he does not know who was interviewed or what documents were reviewed as part of the Company's investigation.  See Pl. Dep. at 195-96 (Exhibit 1).

## M.     PLAINTIFF RETURNS THE EQUIPMENT TO THE COMPANY, APPROXIMATELY HALF OF IT DAMAGED AND UNUSABLE

71.     Plaintiff returned the equipment in five boxes via Federal Express.  See Pl. Dep. at 187-88 (Exhibit 1).

72.     On January 14, 2005, Mr. Kalan and Mr. Colberg opened and inspected the boxes and took an inventory of their contents.  They determined that everything that had been purchased and shipped to Plaintiff's home, as reflected on the purchase orders and invoices, had been returned.  Mr. Kalan determined by visual inspection that the ATM equipment, some of the WIC cards, and the majority of the routers were damaged.  He recalls that approximately half of the equipment was damaged and unusable.  See Kalan Dep. at 237-50 (Exhibit 2); Kalan Affidavit dated December 12, 2006 ¶ 3 (Exhibit 20).

**N.   ON JANUARY 27, 2005, THE COMPANY NOTIFIES PLAINTIFF THAT HIS EMPLOYMENT HAS BEEN TERMINATED**

73.     At the conclusion of the Company's investigation, Mr. Kalan and Mr. Van Akin concluded that Plaintiff had spent Company funds exceeding $50,000 to purchase equipment for an unauthorized project (i.e., a home test lab), then subsequently diverted the shipment of the equipment to his home without the approval of his managers.  They concluded that this conduct violated the PPA policy and essentially amounted to theft.  As a result, they decided to terminate Plaintiff's employment.  See Kalan Aff. ¶ 14 (Exhibit 11); Kalan Dep. at 275-77 (Exhibit 2); Van Akin Dep. at 138-40 (Exhibit 3); French Dep. at 68-70, 98-100 (Exhibit 10).

74.     The damage to the equipment and the Security Department's investigation into whether Plaintiff was engaged in a side business played no part in the decision to terminate Plaintiff's employment.  See Van Akin Dep. at 140, 164-65 (Exhibit 3).

75.     On January 27, 2005, Mr. Kalan and Ms. French called Plaintiff and notified him that his employment was being terminated because he had spent Company funds exceeding $50,000 to purchase equipment for an unauthorized project (i.e., a home test lab), then subsequently diverted the shipment of the equipment to his home without the approval of his managers.  They told him that because he was being terminated for cause, he would not be receiving separation benefits.  He was informed of his COBRA rights and also instructed that he would have to repay the tuition reimbursement he had received from the Company.  See Pl. Dep. at 194, 204-05 (Exhibit 1); Kalan Dep. at 264-65 (Exhibit 2); French Dep. at 163-64, 169 (Exhibit 10).

76.     Plaintiff received a memorandum dated January 27, 2005 confirming that his employment had been terminated the previous day.  (See January 27, 2005 memorandum (Exhibit 21); Pl. Dep. at 196 (Exhibit 1).

77.    Plaintiff believed that the sole reason he had been terminated was because he had purchased equipment without his manager's approval.  See Pl. Dep. at 197, 218 (Exhibit 1).

78.    The same day, Plaintiff sent Ms. French an email accusing the Company of "willfully and unjustly cheat[ing] me out of a separation package that I am entitled to…."  The basis for this accusation is Plaintiff's belief that "the reason for the termination [was] unjustified."  See Pl. Dep. at 197-99 (Exhibit 1).

79.    In her email response to Plaintiff on January 28, 2005, Ms. French instructed Plaintiff to submit a written claim for benefits to the Plan Administrator care of Liz Donnelly. See Email from French to Plaintiff dated January 28, 2005 (Exhibit 22).

**O.    PLAINTIFF'S INITIAL COMMUNICATIONS REQUESTING BENEFITS UNDER THE PLAN ARE NOT RECEIVED**

80.    On January 30, 2005, Plaintiff sent an email to Liz Donnelly in which he wrote, "I am writing to claim full benefits under the Sanofi-Synthelabo Group Separation Package."  See Pl. Dep. at 206 (Exhibit 1); see also Email from Plaintiff to Donnelly dated January 30, 2005 (Exhibit 23).

81.    Ms. Donnelly, Vice President, Compensation and Benefits, provided sworn testimony that to her knowledge, she did not receive the January 30, 2005 email, and had she received it, she would have forwarded it to the Legal Department.  See Deposition of Elizabeth Donnelly taken September 27, 2006 ("Donnelly Dep.") at 44 (Exhibit 24).

82.    On February 9, 2005, Plaintiff sent two separate letters addressed to Ms. Donnelly at 90 Park Avenue, New York, NY, by registered mail.  The first requested a copy of the Plan. The second stated, "I am writing to claim full benefits" under the Plan.  See Pl. Dep. at 208-210 (Exhibit 1); Letters from Plaintiff to Donnelly dated February 9, 2005 (Exhibit 25).

83.     Plaintiff received receipts indicating that someone in the mailroom at 90 Park Avenue had signed for the letters.  The receipts did not have Ms. Donnelly's signature.  See Pl. Dep. at 210-112 (Exhibit 1).

84.     In the beginning of February of 2005, Ms. Donnelly's office was moved from 90 Park Avenue to the Company's new headquarters in Bridgewater, New Jersey.  However, because the human resources function was not scheduled to officially move to Bridgewater until April of 2005, there was no official mechanism in place for forwarding Ms. Donnelly's mail from 90 Park Avenue to her new address in Bridgewater.  As such, Ms. Donnelly's receipt of mail in February of 2005 was intermittent and sporadic.  Ms. Donnelly did not return to 90 Park Avenue until the last business day in March of 2005 to pack up her office.  See Donnelly Dep. at 20-21, 39-42, 89-90 (Exhibit 24); Pl. Dep. at 103 (Exhibit 1).

85.     In the Spring of 2005, Mr. Dew moved his office to Bridgewater and also experienced problems with the receipt of mail addressed to his old address at 90 Park Avenue.  See Dew Aff. ¶ 20 (Exhibit 18).

86.     In light of these circumstances, Ms. Donnelly did not receive either February 9, 2005 letter from Plaintiff.  See Donnelly Dep. at 43-46 (Exhibit 24).

**P.**     **PLAINTIFF FILES A CLAIM FOR BENEFITS UNDER THE PLAN**

87.     On March 21, 2005, Plaintiff's attorney sent a letter to Timothy Rothwell, President and Chief Executive Officer of the Company, stating that Plaintiff had not received a response to either letter to Ms. Donnelly.  The letter also renewed Plaintiff's request for a copy

of the Plan.  See Pl. Dep. at 213-14 (Exhibit 1); Letter from Clark to Rothwell dated March 21,

2005 at A0001-2 (Exhibit 26).[2]

88.     The letter to Mr. Rothwell was forwarded to several individuals, including Ms.

Donnelly.  Having not received the February 9, 2005 letters, Ms. Donnelly contacted her office

and the mailrooms at 90 Park Avenue to see if the letters could be located.  Despite her efforts,

the letters were not located.  See Donnelly Dep. at 49-50 (Exhibit 24).

89.     On March 24, 2005, Ms. Donnelly sent a copy of the Plan to Plaintiff's attorney.

She also instructed Plaintiff to address all further correspondence to the Company's new address

in Bridgewater, New Jersey.  See Pl. Dep. at 214-15 (Exhibit 1); Letter from Donnelly to Clark

dated March 24, 2005 at A0034-43 (Exhibit 26).

## Q.     APPLICABLE PLAN PROVISIONS

90.     The Plan Administrator is the Separation Pay Plan Committee of the Company

(the "Committee").  The Plan provides:

> …. The Plan Administrator has all powers necessary to determine, in its sole
> discretion, all questions concerning the administration of the Plan, including
> questions of eligibility and the amount of any benefits payable hereunder.  It is the
> duty of the Plan Administrator to determine the eligibility of an employee to
> participate in the Plan.  In addition, the Plan Administrator shall have full
> discretionary power and authority to construe, interpret, administer and apply the
> provisions of the Plan, including full power and authority to correct any defects,
> deficiencies, or omissions and to reconcile any inconsistencies herein or supply
> omissions, in such a manner and to such an extent as it deems necessary or
> desirable to effectuate the Plan.  The Plan Administrator may make such rules and
> regulations for the administration of the Plan as it deems necessary or desirable.
> All decisions, actions and interpretations of the Plan Administrator will be made
> in its sole discretion, need not be uniformly applied to similarly situated
> individuals and are final, conclusive and binding on all persons.

See Plan § 10 at A0041 (Exhibit 26).

---

[2] The documents included in the Administrative Record are numbered "A_____".

91.     In the Section 2, titled "Eligibility," the Plan provides: "An employee who … is discharged for 'cause' (as defined below) … is not eligible for a separation payment."  See Plan § 2 at A0035 (Exhibit 26).

92.     The Plan defines "Cause" as follows:

> "Cause" shall be determined in the sole discretion of the Plan Administrator and shall include, but not be limited to, one or more of the following reasons for an employee's involuntary termination: (a) the employee's violation of the Company code of Business Conduct; (b) the employee's violation of another Company policy; (c) a violation of law by the employee; (d) the employee's commission of an act of moral turpitude; (e) the employee's failure to comply with Company policies relating to benefits or Company benefit plans; (f) failure by the employee to perform the function of his or her job; (g) the employee's failure to make measurable and adequate efforts to successfully complete a performance plan; (h) job abandonment, or excessive tardiness or absenteeism; or (i) for other circumstances as determined in the sole discretion of the Plan Administrator.

See Plan § 2 at A0036 (Exhibit 26).

## R.     THE CLAIMS REVIEW PROCEDURE

93.     The claims review procedure is set forth in Section 7 of the Plan.  In 2005, Mr. Dew was responsible for coordination and oversight over the Plan's claims review process.  Mr. Dew's responsibilities also included the adjudication of discipline and ensuring that investigations of employee conduct were thorough and appropriate.  See Dew Aff. ¶ 3 (Exhibit 18); Plan § 7 at A0039 (Exhibit 26).

94.     When a claim for Plan benefits was received, it was forwarded to Mr. Dew.  Mr. Dew then notified Cyndi White, a contract attorney retained by the Company who specialized in employee benefits.  Mr. Dew provided Ms. White with the facts underlying the claim and asked her to evaluate the claim, make a recommendation as to whether it should be granted or denied, and provide the reasoning underlying that recommendation.  He then conveyed Ms. White's recommendation to the Committee, either in a meeting or in a written communication.  To the

extent that the Committee asked for additional facts or analysis, it was provided.  The Committee then voted on the claim.  A letter conveying the disposition of the claim was then sent to the claimant or the claimant's attorney.  This letter typically was drafted by Ms. White, but sent by Elizabeth Donnelly, Vice President, Compensation & Benefits, on behalf of the Plan Administrator.  If the claim was denied, the claimant had the opportunity to appeal the Committee's decision and provide any additional facts or evidence in support of his/her appeal.  See Dew Aff. ¶ 3 (Exhibit 18).

95.     The procedure for adjudicating an appeal was similar.  Generally, when an appeal was received, Ms. White again evaluated the claim, along with any additional facts or evidence provided to her subsequent to the initial denial.  Ms. White then made a recommendation as to whether the appeal should be allowed or denied, and provided the reasoning and facts underlying the recommendation.  This recommendation was conveyed to the Committee and additional facts or analysis were provided upon request.  The Committee then voted on the disposition of the appeal, and a letter conveying the disposition of the appeal was then sent to the claimant or the claimant's attorney.  The letter typically was drafted by Ms. White but sent under Ms. Donnelly's signature on behalf of the Plan Administrator.  See Dew Aff. ¶ 3 (Exhibit 18).

96.     In 2005, the following Company employees were members of the Committee:

Greg Irace, Chief Financial Officer
David Lillback, Vice President, U.S. Human Resources
Brent Ragans, Vice President, Sales & Commercial Effectiveness
John M. Spinnato, Vice President & General Counsel, Pharma Ops Law

See Dew Aff. ¶ 5 (Exhibit 18).

## S.    PLAINTIFF'S CLAIM FOR BENEFITS IS DENIED

97.    Mr. Dew also received a copy of the March 21, 2005 letter to Mr. Rothwell.  He asked Cyndi White to review the claim and described the circumstances that had led to Plaintiff's termination.  See Dew Aff.  ¶ 6 (Exhibit 18).

98.    Ms. White recommended that the claim be denied because Mr. Mohamed was terminated for "cause," as defined by the Plan, and thus he was ineligible for separation pay under the Plan.  See Dew Aff.  ¶ 10 (Exhibit 18).

99.    On April 14, 2005 and May 25, 2005, Plaintiff's attorney sent letters to Ms. Donnelly following up on Plaintiff's claim.  Letter from Clark to Donnelly dated April 14, 2005 at A0065 (Exhibit 26); Letter from Clark to Donnelly dated April 25, 2005 at A0068 (Exhibit 26).

100.    In approximately late May of 2005, Mr. Dew and Ms. Donnelly attended a meeting of the Committee.  The purpose of the meeting was to consider and adjudicate several claims for benefits under the Plan, including Plaintiff's.  With respect to Plaintiff, Mr. Dew explained to the Committee that he had been terminated after a thorough and appropriate investigation by Human Resources because he had made unauthorized purchases of equipment and diverted the shipments to his home.  See Dew Aff. ¶ 11 (Exhibit 18); Donnelly Dep. at 58-59 (Exhibit 24).

101.    At the meeting, the Committee voted unanimously to deny Plaintiff's claim because he had been terminated for "cause."  See Dew Aff.  ¶ 12 (Exhibit 18); Donnelly Dep. at 58-59 (Exhibit 24); Notes at A0070-72 (Exhibit 26).

102.    On June 9, 2005, Ms. Donnelly sent a letter to Plaintiff's attorney conveying the Committee's decision to deny Plaintiff's claim because he had been discharged for "cause."  The letter had been drafted by Ms. White.  See Dew Aff.  ¶ 12 (Exhibit 18); Donnelly Dep. at 60-61

(Exhibit 24); Pl. Dep. at 217 (Exhibit 1); Letter from Donnelly to Clark dated June 9, 2005 at
A0073-74 (Exhibit 26).

**T.      PLAINTIFF APPEALS THE COMMITTEE'S DENIAL OF HIS CLAIM**

103.    By letter dated July 14, 2005, Plaintiff's attorney asked the Committee for twelve
categories of documents which she claimed were "relevant to Mohamed's claim, as part of the
appeal of the decision."  Letter from Clark to Committee dated July 14, 2005 at A0080-82
(Exhibit 26); Pl. Dep. at 224 (Exhibit 1).

104.    Plaintiffs was already familiar with many of the documents requested – such as
Plaintiff's performance evaluations and discipline, documents relating to his purchases, emails
sent to Plaintiff from Mr. Kalan, PPA project approval budget documents for 2004, project plans
for network upgrade projects located on the local drive of his computer, delivery receipts relating
to equipment Plaintiff had installed, records showing the dates of Plaintiff's vacation, documents
relating to the elimination of his job, and documents relating to the New Jersey job offered to
Plaintiff – because he had acquired knowledge of them in the course of his employment at the
Company.  See Pl. Dep. at 224-35 (Exhibit 1).

105.    The July 14, 2005 letter does not explain how any of the documents requested
would assist him in his appeal.  In his deposition, Plaintiff further refused to explain how any of
these documents would have assisted him in his appeal.  See Pl. Dep. at 224-35 (Exhibit 1);
Letter from Clark to Committee dated July 14, 2005 at A0080-82 (Exhibit 26).

106.    Ms. White advised Mr. Dew that aside from a copy of the Plan (which had
already been provided), there was no legal requirement to provide the voluminous documents
requested.  In early August 2005, Ms. White prepared a letter conveying this conclusion to

Plaintiff's attorney.  Mr. Dew advised Ms. Donnelly to mail the letter.  See Dew Aff. ¶ 14 (Exhibit 18).

107.    No documents were provided in response to the July 14, 2005 letter.  See Donnelly Dep. at 66-68 (Exhibit 24).

108.    By letter dated August 1, 2005, Plaintiff's attorney appealed the Committee's denial of his claim. See Letter from Clark to Committee dated August 1, 2005 at A0104-11 (Exhibit 26); Pl. Dep. at 235-36 (Exhibit 1).

**U.      THE COMMITTEE UPHOLDS ITS DENIAL OF PLAINTIFF'S CLAIM**

109.    Upon receipt of the August 1, 2005 letter, Mr. Dew asked Ms. French to provide Ms. White a detailed memorandum describing her investigation and the facts underlying the decision to terminate Plaintiff's employment so that Ms. White could make an independent assessment in assessing whether Plaintiff's termination was indeed for "cause" as defined by the Plan.  Mr. Dew also asked Ms. White to prepare a summary of her analysis and the key facts to be provided to the Committee for its consideration of Mr. Mohamed's appeal.  See Dew Aff. ¶ 15 (Exhibit 18); French Dep. at 198 (Exhibit 10); Email from Dew to French dated September 7, 2005 at A0155 (Exhibit 26).

110.    On September 14, 2005, Ms. French provided Ms. White with a detailed memorandum describing her investigation and the facts underlying the decision to terminate Plaintiff's employment.  Ms. White carefully reviewed the memorandum and made a number of notes of questions to ask Ms. French.  Ms. White and Ms. French then met to discuss Ms. White's questions.  Ms. French also provided Ms. White with the PPA Policy, and a memorandum prepared by the Security Department in its parallel investigation into Plaintiff's purchases.  See Memorandum from French to White dated September 14, 2005 at A0156-59

(Exhibit 26); Memorandum from French to White with White handwritten notes at A0161-63 (Exhibit 26); Email exchange between White, Dew, Donnelly and French at A0172-73 (Exhibit 26), Email exchange between French and White dated September 22, 2005 at A0197-219 (Exhibit 26); Email from White to French dated September 21, 2005 at A0180-84 (Exhibit 26).

111.    In 2005, the Company's Code of Business Conduct ("Business Conduct Policy") was available for viewing on the Company's intranet.  It contains a provision which states: "It is each employee's responsibility to use his or her best efforts, skill and judgment for the sole benefit of Sanofi and with only Sanofi's interests in mind.  In dealings with and on behalf of Sanofi, employees must exercise good faith, loyalty, honesty, and fair dealing."  See Dew Aff. ¶ 17 (Exhibit 18); Business Conduct Policy at A0303 (Exhibit 26); Pl. Dep. at 42 (Exhibit 1).

112.    On September 22, 2005, Mr. Dew sent an e-mail to members of the Committee, with a copy to Ms. Donnelly, attaching Ms. White's summary analysis in a file called "Mohamed History.doc."  Ms. White's analysis set forth a summary of the facts underlying Plaintiff's claim and the legal conclusion that Plaintiff's conduct fell within the definition of a termination "for cause" rendering him ineligible for benefits under the Plan.  See Email from Dew with summary dated September 22, 2005 at A0224-25 (Exhibit 26); Dew Aff. ¶ 16 (Exhibit 18).

113.    Mr. Dew wrote:

> Members of the Committee:
>
> The appeal of Khaled Mohamed for benefits under the Plan was reviewed by counsel in light of the circumstances of the termination, and the attached summary was prepared for your review.  After review of the attached document, please use the voting buttons on this message to vote either "Yes" in favor of upholding the original decision of denial of benefits to Mr. Mohamed, or "No" in favor of overturning that denial and granting benefits to Mr. Mohamed.
>
> Voting must be completed by Tuesday, September 27.

See Email from Dew with summary dated September 22, 2005 at A0225 (Exhibit 26); Dew Aff.

¶ 16 (Exhibit 18).

114.    As of September 26, 2005, Mr. Dew received electronic votes of "Yes" from Mr. Irace and Mr. Lillback.  Mr. Spinnato also orally informed Mr. Dew that his vote was "Yes."  As a result, with 3 of 4 Committee members voting in favor of upholding the denial of separation benefits to Plaintiff, Mr. Dew advised Ms. Donnelly to deliver the denial letter, drafted by Ms. White, to Plaintiff's counsel.  See Dew Aff.  ¶ 18 (Exhibit 18); Electronic Votes at A0226-228 (Exhibit 26).

115.    On or about September 28, 2005, Ms. Donnelly sent a letter to Plaintiff's attorney conveying the Committee's decision to uphold its denial of Plaintiff's claim.  See Letter from Donnelly to Clark dated September 28, 2005 at A0248-250 (Exhibit 26); Dew Aff.  ¶ 18 (Exhibit 18); Donnelly Dep. at 75 (Exhibit 24).

116.    By letter dated September 30, 2005, Plaintiff's attorney requested a response to the July 14, 2005 letter.  See Letter from Clark to Donnelly dated September 30, 2005 at A0257-58 (Exhibit 26); Pl. Dep. at 251 (Exhibit 1).

## V.    PLAINTIFF COMMENCES THIS LAWSUIT AND THE COMPANY FILES COUNTERCLAIMS

117.    Plaintiff filed his Complaint on February 24, 2006.  See Docket No. 1.

118.    On May 1, 2006, Defendants filed their Answer and Affirmative Defenses and the Company's Counterclaims.  The Counterclaims asserted claims for breach of contract, conversion and unjust enrichment based on Plaintiff's unauthorized purchases using Company funds and his failure to repay his tuition.  See Docket No. 7.

119.    On May 23, 2006, Plaintiff filed an Amended Complaint, which contained an additional retaliation claim based on the Counterclaims.  See Docket No. 11.

120.     Plaintiff admits that he is currently employed.  He has also withdrawn his allegation that the Counterclaims "negatively impact his prospective employment."  <u>See</u> Pl. Dep. at 15 (Exhibit 1); Letter from Clark to Newman dated August 7, 2006 (Exhibit 27).

## W.     <u>PLAINTIFF FAILS TO REPAY HIS TUITION</u>

121.     When informed of his termination on January 27, 2005, Plaintiff was advised that he would have to repay the tuition.  Plaintiff said, "it's okay" and that he would be "happy to pay," but asked for a letter in writing.  <u>See</u> Pl. Dep. at 204-05 (Exhibit 1).

122.     The Company has previously demanded repayment of tuition by other former employees.  <u>See</u> French Dep. at 179-180 (Exhibit 10); <u>see</u> <u>also</u> Documents reflecting demands of tuition repayment (Exhibit 28).

123.     Plaintiff testified that if he were to receive a letter demanding repayment of the tuition, he would pay it back after consultation with his lawyer.  <u>See</u> Pl. Dep. at 205 (Exhibit 1).

124.     Ms. French requested the preparation of a letter to Plaintiff demanding repayment of his tuition.  However, the letter was never sent because of the confusion over responsibilities during the merger with Aventis.  <u>See</u> French Dep. at 179-83 (Exhibit 10); Draft Education Assistance Plan Letters dates February 24, 2005 (Exhibit 29).

125.     As of the date of this Motion, despite Plaintiff's awareness of his tuition reimbursement obligation and the Company's Counterclaim seeking repayment of the tuition, Plaintiff has not repaid the tuition.  <u>See</u> Pl. Dep. at 205 (Exhibit 1).

## X.      IN 2004 AND 2005, THE COMPANY PAYS OVER $14 MILLION IN SEPARATION BENEFITS

126.    Plaintiff admits that he has no idea how many other employees were separated from the Company as a result of the merger.  He also does not know the amount of benefits paid to separated employees under the Plan.  <u>See</u> Pl. Dep. at 125-26 (Exhibit 1).

127.    The total payments made to employees under the Plan in 2004 and 2005 exceeded $14 million.  <u>See</u> Affidavit of Elizabeth Donnelly dated February 8, 2007 ¶ 5 (Exhibit 30).

128.    Plaintiff seeks approximately $85,000 in separation pay benefits.  <u>See</u> Plaintiff's Initial Disclosures (Exhibit 32).

Dated: February 9, 2006
New York, New York

<u>/s/  Tamsin J. Newman</u>
MORGAN, LEWIS & BOCKIUS LLP
Tamsin J. Newman (TN-4219)
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000

Of Counsel:

MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Attorney for Defendants
sanofi-aventis U.S. Inc., Sanofi-Synthelabo
Group Separation Pay Plan, and Sanofi-Synthelabo
Group Separation Pay Plan Committee