UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                               :

KHALED MOHAMED,               :

                   :

            Plaintiff,   :

         v.                  :        06 Civ. 1504

                   :       **Opinion & Order**

SANOFI-AVENTIS PHARMACEUTICALS,   :
SANOFI-SYNTHELABO GROUP SEPARATION  :
PAY PLAN and SANOFI-SYNTHELABO     :
SEPARATION PAY PLAN COMMITTEE       :

                   :

            Defendants.   :

                   :
------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/22/09

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

      On February 24, 2006, Plaintiff Khaled Mohamed

("Plaintiff") filed suit against Defendants Sanofi-Aventis

Pharmaceuticals ("Sanofi" or the "Company"), Sanofi-Synthelabo

Group Separation Pay Plan (the "Plan"), and Sanofi-Synthelabo

Separation Pay Plan Committee (the "Committee) (collectively

"Defendants"), asserting claims related to the denial of

employee severance benefits to Plaintiff.  For the reasons set

forth below, (1) Plaintiff's claim that Defendants denied him

benefits to which he is entitled in violation of the Employee

Retirement Income Security Act of 1974, as amended, 29 U.S.C. §

1001 et seq. ("ERISA") is REMANDED to the Committee; (2)

Plaintiff's ERISA section 510 claim for retaliatory termination

is DISMISSED; (3) Plaintiff's motion for summary judgment on his

claim that the Committee violated ERISA section 502(c)(1) is GRANTED, and the Court awards a $1,200 penalty against the Committee to Plaintiff; (4) Plaintiff's claim that Defendants' counterclaims are retaliatory in violation of ERISA section 510 is DISMISSED; and (5) Plaintiff's motion for judgment as a matter of law on Defendants' counterclaims is DENIED, and Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment on the counterclaims are DENIED.

## BACKGROUND[1]

This case arises out of the termination of Plaintiff's employment as a director of Network Services at Sanofi and Defendants' subsequent denial of severance benefits to him.

Plaintiff alleges that Defendants denied him benefits to which he is entitled, in violation of ERISA; that Defendants interfered with Plaintiff's rights under ERISA by terminating him because he exercised those rights; that Defendants violated

---

[1] The facts stated here are drawn from Defendants' Local Rule 56.1 statement and from Plaintiff's submissions.  Under Local Civil Rule 56.1(c), "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted . . . ."  See also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

While Plaintiff's Local Rule 56.1 statement attempts to admit a fact stated in Defendants' Local Rule 56.1 statement for purposes of Plaintiff's motion and deny that fact for purposes of Defendants' motion, the Court ignores this maneuver and finds disputes of material fact only where there is evidence to support opposing propositions.

2

ERISA section 502(c)(1), 29 U.S.C. § 1132(c)(1), by refusing to supply information requested by Plaintiff regarding the Plan and his claim for benefits; and that Defendants' counterclaims constitute unlawful retaliation for the filing of the complaint in this action (the "Complaint").   (Amended Compl. ¶¶ 54-65.) In their counterclaims, Defendants allege that Mohamed breached a contract for tuition repayment, converted Defendants' monetary property, and was unjustly enriched. (Defendants' Answer, Affirm. Defenses and Counterclaims ¶¶ 1-27.)

Sanofi is a global pharmaceutical company. (Def's. Rule 56.1 Stmt. ¶ 1; Pl.'s Rule 56.1 Stmt. ¶ 1.)   In approximately July 1997, Plaintiff began working at the New York City office of Sanofi's predecessor, Sanofi-Synthelabo, as a Network Technologist. (Id.)   After a series of promotions, Plaintiff became Associate Director of Network Services, the unit responsible for the Company's network, server and communications infrastructure. (Id. ¶ 2.)   Mohamed held the Associate Director position until January 27, 2005, when his employment was terminated. (Id. ¶ 1.)   As Associate Director, Plaintiff reported to Neil Kalan, the Director of Network Services. (Id. ¶ 2.)   Kalan, in turn, reported to Rick Van Akin, the Senior Director. (Id.)   During this period, Mohamed received positive evaluations and tuition assistance pursuant to an agreement in which the Company paid Plaintiff's tuition to Pace University in

3

the amount of $8,800 and Plaintiff committed to repay the funds
if he resigned or was terminated for "cause."   (Id. ¶¶ 18-19,
21.)

     The Company required all projects regardless of amount and
all other departmental expenditures of $50,000 or more to be
approved pursuant to its Project Pre-Approval and Purchasing
Policy ("PPA Policy").   The PPA Policy required the preparation
of a project plan, including a justification for the project and
an estimate of its cost, as well as the submission of purchase
order requests to the Purchasing Department for payment.
(Def's. Rule 56.1 Stmt. ¶¶ 9-10; Pl.'s Rule 56.1 Stmt. ¶¶ 9-10.)
The PPA Policy prohibited "[s]plitting projects into smaller
segments to circumvent approval limits," although it provided
that "[a] single project may require engagement of multiple
vendors and result in multiple purchase orders and/or
contracts."   (Id. ¶ 7.)   While Plaintiff had never seen a
written copy of the PPA Policy, he was familiar with it and
understood that its purpose was to ensure manager approval for
projects.   (Id. ¶¶ 8-10.).   In fact, Plaintiff had applied and
received approval for three projects to be completed in 2004.
(Id. ¶ 12.)

     With respect to non-PPA Policy purchases, employees were
limited by their "signature authority" in completing purchase
requests: if the purchase exceeded an employee's signature

authority, he or she was required to obtain additional levels of approval before submitting the purchase request.  (Id. ¶ 14.) Plaintiff's signature authority was $12,500, although Plaintiff testified at his deposition that he was unaware of this limit and there is no evidence showing that he was informed of it. (Pl.'s Rule 56.1 Stmt. ¶ 15.)

As an employee who, in the eyes of Van Akin, "live[d] and breath[ed] work" (Van Akin Dep. 148:18-21, Sept. 22, 2006.), on multiple occasions Plaintiff took networking equipment home to test and configure before returning the equipment for installation within the Company's network.  (Pl.'s Rule 56.1 Stmt. ¶ 201.)  On occasion, Plaintiff had the equipment shipped directly to his home.  (Pl.'s Rule 56.1 Stmt. ¶¶ 67, 139-47.)[2] These practices had never been questioned.  (Pl.'s Rule 56.1 Stmt. ¶ 201.)  According to Plaintiff, on multiple occasions he made purchases exceeding the $12,500 limitation and was never questioned about them.  (Pl.'s Rule 56.1 Stmt. ¶ 147, 203.)[3]

In mid-2004, the Company announced its plans to merge with Aventis Pharmaceuticals Inc. ("Aventis"), a company with headquarters in Bridgewater, New Jersey.  (Def's. Rule 56.1 Stmt. ¶ 22; Pl.'s Rule 56.1 Stmt. ¶ 22.)  When the merger was

---

[2] Sanofi's records include an invoice from a 2003 purchase which lists Plaintiff's home address as the "ship to" address.  (Clark Aff. Exh. R.)
[3] Plaintiff made purchases that were charged to a budget line number, not a PPA number, that exceeded $12,500.  For example, in November 2003 he requested and received a purchase order for $44,608.  (Clark. Aff. Exh. Q.)

announced, the Network Services department was instructed to
cease all spending towards new initiatives as no decision had
been made as to what technologies would be used after the
merger. (Kalan Aff. ¶¶ 5-6.)[4]  Kalan conveyed this directive to
all members of the department, including Plaintiff, at one or
more departmental meetings. (Id. ¶ 5.)

    Plaintiff understood that as a result of the merger, the
Company's headquarters would be relocated to Bridgewater and
that some positions at the Company's corporate headquarters in
New York City would be eliminated or moved to Bridgewater. (Id.
¶ 23.)  In October or November of 2004, Plaintiff received the
Company's Separation Policy, which provided that employees who
were not offered a comparable position or who were offered a
comparable position but lived more than 40 miles from the
Company's New Jersey headquarters were eligible for separation
pay benefits. (Id. ¶ 25.)  The total payments made to employees
under the Plan in 2004 and 2005 exceeded $14 million. (Id. ¶
127.)

    In a telephone call in late November or December of 2004,
Van Akin offered Plaintiff a position as a network engineer at
the Company's new headquarters in Bridgewater. (Id. ¶ 27.)  Van

---

[4] Plaintiff attempts to contest Kalan's testimony on this point by noting that
"Kalan himself claims to have purchased computer networking equipment in late
2004." (Pl.'s Rule 56.1 Stmt. ¶ 22.)  However, Kalan's purchasing practices
may have violated this directive, and thus do not contradict directly his
testimony that the Network Services Department was instructed to cease all
spending.

Akin testified at his deposition that he communicated to
Plaintiff that "I would love to have him on my team." (Van Akin
Dep. 76:17-21, Sept. 22, 2006.) According to Plaintiff, in
addition to being a significant commute from Plaintiff's home in
Queens, New York, the position entailed significantly less
responsibility and Plaintiff felt taking the position would be
"demeaning." (Pl.'s Rule 56.1 Stmt. ¶ 240.) Plaintiff told Van
Akin that he was not interested in the position and that he was
pursuing a position in another division. (Def's. Rule 56.1
Stmt. ¶ 27; Pl.'s Rule 56.1 Stmt. ¶ 27.) A few days later, Van
Akin again offered Plaintiff the New Jersey position but
Plaintiff reiterated that he was pursuing another position.
(Id. ¶ 28.) At his deposition, Van Akin recalled asking
Plaintiff, "[I]s there anything we can do to convince you this
would be a good position for you?" (Van Akin Dep. 77:21-78:22,
Sept. 22, 2006.) According to Van Akin, no employee other than
Plaintiff who had been offered a position on Van Akin's team
chose to leave and receive severance. (Van Akin Dep. 72:17-25,
Sept. 22, 2006.)

From November 11, 2004 through December 1, 2004, Plaintiff
completed nine purchase order requests using Company funds for
equipment from a vendor. (Def's. Rule 56.1 Stmt. ¶ 29; Pl.'s

Rule 56.1 Stmt. ¶ 29.)[5]  "As he negotiated various deals with the
vendor, and received quotations, he sent requests to purchasing
for purchase orders with copies of the estimates he had
received.  Sometimes he asked for multiple purchase orders in a
single day, to get the best price for Sanofi."  (Pl.'s Rule 56.1
Stmt. ¶ 208.)  Plaintiff also contacted the vendor to change the
shipment address from the default corporate address to his home
address.  (Def's. Rule 56.1 Stmt. ¶ 29; Pl.'s Rule 56.1 Stmt. ¶
29.)  It is undisputed that Plaintiff did not ask permission to
make these purchases or to have them shipped to his home.  (Id.
¶ 33.)

     According to a report of a professor of computer science
introduced by Plaintiff, the equipment Plaintiff purchased (the
"Contested Equipment") was industrial-grade networking hardware
that was compatible with Sanofi's network and unsuitable for
personal or home use.  (Pl.'s Rule 56.1 Stmt. ¶ 208; Clark. Aff.
Ex. FF.)  The Contested Equipment required testing and pre-
configuration prior to installation in Sanofi's network.  (Id.)
Plaintiff planned to do this work from home because he was
planning to be out of the office from Friday, December 3, 2004

---

[5] Sanofi's records indicate that in 2003 Plaintiff ordered equipment from the
same vendor and at least two of the items are identical to items of the
Contested Equipment.  (Id. ¶ 141.)

8

through early January 2005 for training and for vacation. (Id. ¶¶ 207-08.)[6]

During his vacation, Van Akin called Plaintiff and informed him that his job was being eliminated and again offered Plaintiff the position in New Jersey. (Def's. Rule 56.1 Stmt. ¶ 42; Pl.'s Rule 56.1 Stmt. ¶42.) Plaintiff again declined. (Id. ¶ 43.)

During Plaintiff's absence, Kalan learned of Plaintiff's purchases and initiated an investigation. (Def's. Rule 56.1 Stmt. ¶ 45.) When Plaintiff returned to work on January 12, 2005, he met with Kalan and Caroline French, Human Resources Specialist, to discuss his purchase of the Contested Equipment and its shipment to his home. (Def's. Rule 56.1 Stmt. ¶ 52; Pl.'s Rule 56.1 Stmt. ¶ 52.) Plaintiff explained that he had shipped the Contested Equipment to his home and that he was in the process of testing and reconfiguring the equipment there, which he had planned to do the week between December 25, 2004 and January 1, 2005. (Id. ¶ 52; Mohamed Dep. 180:1-6, Aug. 10, 2006.) At the request of Kalan and French, Plaintiff drew a picture depicting how he planned to test and reconfigure the equipment. (Id. ¶ 53.) French and Kalan testified at their depositions that based on Plaintiff's responses to their

---

[6] Plaintiff's absence was extended with Sanofi's permission until January 12, 2005 due to a family emergency. (Pl.'s Rule 56.1 Stmt. ¶ 209.)

questions and his drawing, they understood that Plaintiff was building a "test lab" in his apartment. (French Dep. 47:23-25, Sept. 26, 2006; Kalan Dep. 224:17-22, Sept. 21, 2006.) Plaintiff testified at his deposition that he was aware that the Company had a test lab at its New York City office. (Def's. Rule 56.1 Stmt. ¶ 55; Pl.'s Rule 56.1 Stmt. ¶ 55.) During this conversation, Plaintiff acknowledged to Kalan and French that he "did not ask for permission" to ship the Contested Equipment to his home. (Mohamed Dep. 179:24-25, 184:24-185:11, Aug. 10, 2006.) However, Plaintiff explained that he had asked Kalan for permission to take home equipment that the Company already had in its inventory, but that he did not believe there was an approval process for purchasing new equipment. (French Dep. 134:13-137:8, Sept. 26, 2006.) Plaintiff also told French and Kalan that the purchases were made pursuant to a Network Hardware Upgrade PPA. (Pl. Aff. ¶ 17.)

As requested, Plaintiff shipped the Contested Equipment to the Company's offices via Federal Express in boxes marked "Fragile" and "This Side Up." (Def's. Rule 56.1 Stmt. ¶ 71; Pl.'s Rule 56.1 Stmt. ¶ 71; Kalan Dep. 238:12-21, Sept. 21, 2006.) Although the Company's legal department was informed in January 2005 that Plaintiff had consulted a lawyer, on March 28, 2005 Kalan wrote to Van Akin that, having consulted with French, he had decided to "toss the broken stuff" or "no longer . . .

10

keep . . . isolated" the Contested Equipment. (Pl.'s Rule 56.1 Stmt. ¶¶ 169, 172, Clark. Aff. Ex. K.)

At the conclusion of the Company's investigation, Kalan, Van Akin, and French--in consultation with the Human Resources and Legal Departments--concluded that Plaintiff had spent Company funds exceeding $50,000 to purchase the Contested Equipment for an unauthorized project and then subsequently diverted the shipment of the Contested Equipment to his home without the approval of his managers. (Def's. Rule 56.1 Stmt. ¶ 73; Pl.'s Rule 56.1 Stmt. ¶ 73.) They concluded that this conduct violated the PPA policy, and decided to terminate Plaintiff's employment. (Id.)

On January 27, 2005, Kalan and French called Plaintiff and notified him that his employment was being terminated because he purchased equipment without the approval of his managers. (Mohamed Dep. 194:2-13, Aug. 10, 2006.) Plaintiff sent French an e-mail stating that he understood he was terminated without benefits because he ordered hardware without approval. (Defs.' Exh. 22.) Plaintiff requested that French review his purchasing records which, according to Plaintiff, would show that such was his routine practice. (Id.) French instructed Plaintiff to submit a written claim for benefits to the Plan Administrator care of Liz Donnelly. (Def's. Rule 56.1 Stmt. ¶ 79; Pl.'s Rule 56.1 Stmt. ¶ 79.) Plaintiff was advised that he would have to

11

repay the tuition assistance and replied that he would be "happy to pay," but asked for a letter in writing.  (Id. ¶ 121.) French prepared a letter demanding repayment of Plaintiff's tuition, but the letter was never sent due to confusion over responsibilities during the merger.  (Id. ¶ 124.)[7]

On February 9, 2005, Plaintiff sent two separate letters by certified mail addressed to Donnelly at the Company's New York headquarters, the address for the Administrator listed in the Plan.  The first letter requested a copy of the Plan and the second claimed severance benefits.  (Def's. Rule 56.1 Stmt. ¶ 82; Pl.'s Rule 56.1 Stmt. ¶ 82.)  Plaintiff sought approximately $85,000 in severance benefits.  (Id. ¶ 128.)  The letters were signed for by an employee in the Company's mailroom on February 10, 2005.  (Id. ¶ 83.)  Defendants claim that Donnelly never received either letter because her office was being moved to the Company's new headquarters in New Jersey at the time and there was no mechanism in place for forwarding her mail.  (Def's. Rule 56.1 Stmt. ¶¶ 84, 86.)  However, two of Defendants' internal documents contain notations reflecting that Plaintiff's claim was filed February 9, 2005.  (Def. Exh. 26 at A0129, A0320.)[8]

---

[7] In 2003, the Company made demands of one employee for tuition reimbursement and, with respect to another employee, executed a settlement agreement stating that the Company waives any claim it might have for tuition reimbursement.  (Def's. Rule 56.1 Stmt. ¶ 122; Pl.'s Rule 56.1 Stmt. ¶ 122.)
[8] These documents are a copy of Plaintiff's benefits appeal letter with a handwritten notation and an analysis and recommendation by a contract attorney.  They are described in greater detail below.

On March 21, 2005, Plaintiff's attorney sent a letter to the President and Chief Executive Officer of the Company, stating that Plaintiff had not received a response to either letter to Donnelly and renewing Plaintiff's request for a copy of the Plan. (Def's. Rule 56.1 Stmt. ¶ 87; Pl.'s Rule 56.1 Stmt. ¶ 87.) This letter was forwarded to Donnelly, who then sent a copy of the Plan to Plaintiff's attorney on March 24, 2005. (Id. ¶¶ 88-89.)

The Plan provides that an employee who is discharged for "cause" is ineligible for benefits. (Exh. 26 at A0017-18.) "Cause" includes an employee's violation of the Company Code of Business Conduct or violation of another Company policy. (Id. at 2.)

In 2005 Kevin Dew, the Associate Vice President of Human Resources Policies and Practices, was responsible for coordinating and overseeing the Plan's claims review process. (Def's. Rule 56.1 Stmt. ¶ 93; Pl.'s Rule 56.1 Stmt. ¶ 93.) Upon receiving a copy of the Plaintiff's March 21, 2005 letter, Dew asked Cyndi White, a contract attorney retained by the Company who specialized in employee benefits, to review the claim. Dew described to White the circumstances that had led to Plaintiff's termination. (Def's. Rule 56.1 Stmt. ¶ 97.) On April 14, 2005 and May 25, 2005, Plaintiff's attorney sent letters to Donnelly following up on Plaintiff's claim. (Def's. Rule 56.1 Stmt. ¶

13

99; Pl.'s Rule 56.1 Stmt. ¶ 99.) In approximately late May of 2005, Dew and Donnelly attended a Committee meeting during which the decision was made to deny Plaintiff's severance claim. (Id. ¶ 100.) Dew explained to the Committee that Plaintiff had been terminated after an investigation by Human Resources because he made unauthorized purchases of equipment and diverted the shipments to his home. (Id.) Dew's notes from the meeting contain the following notation: "Khaled Mohamed--cause." (Exh. 26 at A0071.) Donnelly testified that the Committee considered no documents concerning Plaintiff's claim during the meeting, although she did not know whether the Committee had considered relevant documents prior to the meeting. (Donnelly Dep. 59:7-15, Sept. 27, 2006.)

On June 9, 2005, Donnelly sent a letter ("Initial Denial Letter") to Plaintiff's attorney conveying the Committee's decision to deny Plaintiff's claim because he had been terminated for "cause." (Exh. 26 at A0073-74.) The Initial Denial Letter stated succinctly that Plaintiff was discharged for "cause" by the Company as defined in the Plan and "he is thus ineligible to receive separation pay under the Plan." (Id.) The Initial Denial Letter also set forth Plaintiff's appeal rights and stated that Plaintiff "is entitled to receive . . . all documents, records and other information relevant to his claim for benefits." (Id.)

14

By letter dated July 14, 2005, Plaintiff's attorney asked
the Committee for twelve categories of documents which were
claimed to be "relevant to Mohamed's claim, as part of the
appeal of the decision." (Exh. 26 at A0080-81.) Plaintiff had
seen or remembered generally many of these documents--such as
Plaintiff's performance evaluations and discipline, documents
relating to his purchases, e-mails sent to Plaintiff from Kalan-
-but did not have detailed familiarity with them. (Pl.'s Rule
56.1 Stmt. ¶ 104.) White advised Dew that aside from a copy of
the Plan, there was no legal requirement to provide the
requested documents. (Def's. Rule 56.1 Stmt. ¶ 106.) Although
White prepared a letter conveying this conclusion to Plaintiff's
attorney, the letter was apparently never sent. (Def's. Rule
56.1 Stmt. ¶ 106; Pl.'s Rule 56.1 Stmt. ¶ 106.) No documents
were provided in response to the July 14, 2005 letter. (Id. ¶
107.)

By letter dated August 1, 2005 ("Plaintiff's Appeal
Letter"), Plaintiff appealed the Committee's denial of his
claim, noting that no response to the document request had been
received and reserving the right to supplement the appeal when
the documents were produced. (Exh. 26 at A0104-07.) Plaintiff
argued that the Initial Denial Letter's "one sentence assertion
that Mohamed was fired for 'cause' provides no specifics, no
rationale and no account of the evidence that the Committee

15

relied upon to reach its decision." (Id. at A0105.) Plaintiff

further contended that "company records demonstrate that he had

full authority to make hardware purchases and had been doing so

for two years with management's knowledge." (Id. at A0106.)

Dew asked French to provide White a detailed memorandum

describing French's investigation and the facts underlying the

decision to terminate Plaintiff's employment so that White could

assess whether Plaintiff's termination was indeed for "cause."

(Def's. Rule 56.1 Stmt. ¶ 109; Pl.'s Rule 56.1 Stmt. ¶ 109.)

Dew asked White to prepare a summary of her analysis and the key

facts to be provided to the Committee for its consideration of

Plaintiff's appeal. (Id.) On September 14, 2005, French

provided White a memorandum describing her investigation and the

facts underlying the decision to terminate Plaintiff's

employment, as well as a copy of the PPA Policy and Security

Department memorandum. (Id. ¶ 110; Exh. 26 at A0161-63.)

On September 22, 2005, Dew Sent an e-mail to members of the

Committee with a copy to Donnelly attaching White's analysis

(the "White Memo") which summarized how Plaintiff had shipped

the Contested Equipment to his home without permission from his

manager and had exceeded his individual and departmental

purchasing authority. (Exh. 26 at A0224-25.) White concluded

that these actions violated the Company's Code of Business

Conduct and the PPA Policy and therefore fell within the Plan's

definition of a termination for "cause." (Id.) The White Memo
included no evidence or arguments in Plaintiff's favor, such as
Plaintiff's claim that he had full authority to make such
purchases without management approval for two years. (Id.)

By September 26, 2005, Dew had received electronic votes of
"Yes" from two members of the Committee and a third informed Dew
orally that his vote was the same. (Def's. Rule 56.1 Stmt. ¶
111; Pl.'s Rule 56.1 Stmt. ¶ 111.) On or about September 28,
2005, Donnelly sent a letter (the "Appeal Denial Letter") to
Plaintiff's attorney conveying the Committee's decision to
uphold its denial of Plaintiff's claim. (Def's. Rule 56.1 Stmt.
¶ 115; Pl.'s Rule 56.1 Stmt. ¶ 115.) The letter acknowledged
Plaintiff's request for a "revised Denial Letter providing
citation to the specific sub-section of the Plan's definition of
'cause'" and stated that "[i]f you should still hold to the
belief that the prior denial letter of June 9, 2005 was
insufficient, you may alternatively treat this letter as such
'revised Denial Letter,' thereby recreating Mr. Mohamed's
opportunity to appeal the denial . . . ." (Exh. 26 at A0248.)
Alternatively, the letter explained, Plaintiff could consider
the letter a determination on appeal. (Id. at A0250.)[9] The

---

[9] Plaintiff explains that given his repeated unsuccessful requests for
documents upon which to base further appeal, he was forced to treat the
denial letter as an appeal denial. (Pl.'s Mem. of Law in Support of Pl.'s
Motion for Partial Summ. Judg. and in Opp. to Defs.' Motion for Summ. Judg.
38 n.6.)

letter explained that Plaintiff was terminated for violating the Code of Business Conduct and Company policy; that the Company disputed Plaintiff's assertions that he "had full authority to make hardware purchases and had been doing so for years" and "never needed Mr. Kalans' authority to purchase hardware for any purpose"; that Plaintiff exceeded his purchasing authority on two purchases in November 2004 and ordered equipment in multiple small increments totaling over $50,000 over a short period of time, both in violation of the PPA Policy; that Plaintiff changed the shipping address for the Contested Equipment to his home address and asked a colleague to use the Company's purchasing card to ship equipment to Plaintiff's home; and that Plaintiff lacked permission, implicit or otherwise, to ship the Contested Equipment to his home. (Id. at A0249.) The letter concluded: "These actions and others not detailed herein violate the [sic] not only the PPA and Purchasing Policy but the Company's Code of Business Conduct" and therefore fall within the definition of "cause." (Id.)[10]

Having elected to treat the September 28, 2005 letter as a denial on appeal rather a revised denial letter, Plaintiff commenced suit in this Court on February 24, 2006. On May 1, 2006, Defendants filed counterclaims and, on May 23, 2006,

---

[10] The Court notes that although the Appeal Denial Letter may suggest that the Committee was aware of Plaintiff's defenses, as discussed in greater detail below, there is no evidence that any of Plaintiff's defenses were before the Committee when it decided Plaintiff's appeal.

18

Plaintiff filed an Amended Complaint which contained an
additional retaliation claim based on Defendants' counterclaims.

## **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides
that a court shall grant a motion for summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(c). "The party seeking
summary judgment bears the burden of establishing that no
genuine issue of material fact exists and that the undisputed
facts establish her right to judgment as a matter of law."
Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir.
1995). The substantive law governing the case will identify
those facts that are material and "[o]nly disputes over facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact
exists, a court must resolve all ambiguities and draw all
reasonable inferences against the moving party. See Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986). "If, as to the issue on which summary judgment is

sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

These are the general principles that govern the Court's review of summary judgment motions. However, as discussed below, there are also specific standards for reviewing summary judgment motions in the ERISA context.

# DISCUSSION

Plaintiff claims that (1) Defendants denied him benefits to which he is entitled, in violation of ERISA; (2) Defendants unlawfully interfered with Plaintiff's rights under ERISA by terminating him in retaliation for his assertion of his right to severance benefits; (3) Defendants violated ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), by refusing to supply information Plaintiff requested; and (4) Defendants' counterclaims constitute unlawful retaliation for Plaintiff's filing of the Complaint. In their counterclaims, Defendants allege that Plaintiff breached his tuition assistance contract, converted Defendants' monetary property, and was unjustly enriched. (Defendants' Answer, Affirm. Defenses and Counterclaims ¶¶ 1-27.)

20

### 1. Denial of Severance Benefits

Plaintiff's claim that Defendants denied him severance benefits to which he is entitled in violation of ERISA centers on his contention that the undisputed evidence demonstrates that Defendants' procedures were so deficient that they call into question the integrity of the denial decision itself. Defendants move for summary judgment on this claim, arguing that the Committee correctly denied benefits after a thorough investigation and benefits review process because Plaintiff was terminated for "cause."  Plaintiff cross-moves for summary judgment on this claim, and also contends that, at minimum, factual issues preclude summary judgment on this issue.

"Where an ERISA-covered plan grants the plan administrator with discretionary authority to determine eligibility for benefits, a court must review the administrator's decision under the arbitrary and capricious standard."  Anderson v. Sotheby's, Inc., 04 Civ. 8180, 2006 WL 1722576, *15 (S.D.N.Y. 2006). "Where the decision to grant or deny [ERISA] benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  Id. at *14.  "Instead, a district court must review a plan administrator's decision denying benefits and, in so doing,

may rely only on the evidence contained in the administrative record." Id. "[T]he district court sits in effect as an appellate court to determine whether the denial of ERISA benefits was arbitrary and capricious." Id.

"Under this highly deferential standard of review, this Court cannot substitute its own judgment for that of the Plan Administrator and will not overturn a decision to deny or terminate benefits unless it was without reason, unsupported by substantial evidence or erroneous as a matter of law." Fuller v. J.P. Morgan Chase & Co., 423 F.3d 104, 107 (2d Cir. 2005) (internal quotation marks omitted). "Accordingly, an administrator's decision cannot be disturbed if it is consistent with the terms of the plan, based on a consideration of the relevant factors, and supported by substantial evidence." Anderson, 2006 WL 1722576, at *14.

The parties agree that the Plan confers discretionary authority on the Committee. The Court concurs.[11] However, Plaintiff argues that he is nevertheless entitled to de novo review because the benefits decision was unlawfully delegated to Dew, French and White, who are not named Plan fiduciaries. As discussed in greater detail below, the benefits decision was not

---

[11] The Plan provides: "The Plan Administrator has all powers necessary to determine, in its sole discretion, all questions concerning the administration of the Plan, including questions of eligibility . . . . All decisions, actions and interpretations of the Plan Administrator will be made in its sole discretion . . . ." Plan § 10, Exh. 26 at A0041 (emphasis added).

unlawfully delegated to non-fiduciaries.  Plaintiff also argues

that de novo review is appropriate because the Committee members

operated under a conflict of interest in that Sanofi was the

employer responsible for Plaintiff's termination as well as the

administrator responsible for reviewing that decision.  But it

is undisputed that the Committee members did not make the

decision to terminate Plaintiff's employment.  Finally,

Plaintiff requests de novo review because the Committee was made

up of Sanofi employees and was therefore the Plan administrator

and the benefits payor.  The Supreme Court has recognized that

where company employees are the administrator and payor, "the

employer has an interest . . . conflicting with that of the

beneficiaries," see Metropolitan Life Ins. Co. v. Glenn, 128

S.Ct. 2343, 2348 (2008) (internal quotation marks omitted).

Therefore, the Court finds that the Committee members operated

under a conflict of interest in that they were both the Plan

administrator and benefits payor.

Following Glenn, the Second Circuit has explained that "a

plan under which an administrator both evaluates and pays

benefits claims creates the kind of conflict of interest that

courts must take into account and weigh as a factor in

determining whether there was an abuse of discretion, but does

not make de novo review appropriate.  This is true even where

the plaintiff shows that the conflict of interest affected the

choice of a reasonable interpretation." McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008) (emphasis added). Therefore, while the Court rejects Plaintiff's request for de novo review, the Court is mindful that the Committee's status as a conflicted claims administrator is a factor in an evaluation, under an arbitrary and capricious standard, of whether Defendants abused their discretion in denying Plaintiff's claim. See Am. Soc'y for Technion-Israel Inst. of Tech., Inc. v. First Reliance Std. Life Ins. Co., 2009 U.S. Dist. LEXIS 82306, *11 (S.D.N.Y. Sept. 3, 2009) (taking this approach); see also Arnone v. CA, Inc., No. 08 Civ. 4458, 2009 WL 362304, *5 (S.D.N.Y. 2009) (internal quotation marks omitted) ("[B]ecause Goodman serves two masters--the CA Severance Plan and CA, Inc.-- . . . this Court will carefully review Goodman's exercise of his discretion.").

Plaintiff's claim of procedural error in the benefits determination focuses on the following issues: (i) the Committee failed to make a decision on his claim within 90 days; (ii) the Committee failed to provide adequate notice of the specific reasons for denial; (iii) the Committee failed to provide the evidence upon which it relied to Plaintiff; (iv) the Committee unlawfully delegated its fiduciary authority; (v) the Committee or its delegatees "cherry-picked" evidence, ignoring evidence in Plaintiff's favor; (vi) the Committee operated under a conflict

of interest; and (vii) the Committee failed to consult an expert about networking hardware.

(i)   The regulations require a plan administrator to notify the claimant of a decision within "90 days after receipt of the claim by the plan, unless the plan administrator determines that special circumstances require an extension of time for processing the claim."   29 C.F.R. § 2560.503-1(f)(1).[12] Plaintiff contends that it is undisputed that Plaintiff's letter claiming severance benefits was received in Defendants' mailroom on February 10, 2005 and the Committee was therefore required to decide Plaintiff's claim by May 11, 2005.   However, no response was provided until June 9, 2005.   In Plaintiff's view, "[t]his failure demonstrates defendants' unconcern with providing any meaningful consideration of Mohamed's claims."   (Pl.'s Mem. of Law in Support of Pl.'s Motion for Partial Summ. Judg. and in Opp. to Defs.' Motion for Summ. Judg. 21.)   Defendants respond that Donnelly never received the letter because her office was being moved to the Company's new headquarters at the time and there was no mechanism in place for forwarding her mail. (Def's. Rule 56.1 Stmt. 84, 86.)

---

[12] "If the plan administrator determines that an extension of time for processing is required, written notice of the extension"--indicating the special circumstances requiring the extension--"shall be furnished to the claimant prior to the termination of the initial 90-day period."   29 C.F.R. § 2560.503-1(f)(1).

It is undisputed that the letters were signed for by an employee in the Company's mailroom on February 10, 2005. Plaintiff can hardly be faulted for Defendants' failure to have a mechanism in place for forwarding Donnelly's mail from the official Plan address.  Moreover, Defendants were apparently aware of the February 9, 2005 claim date as two of Defendants' own internal documents contain notations reflecting that date. (Def. Exh. 26 at A0129, A0320.)  Therefore, the Court finds that Defendants failed to decide Plaintiff's claim within 90 days, in violation of the regulations.  The Court considers this as one factor--although not a substantial one--weighing in favor of a finding that there was a procedural abuse of discretion.

(ii)  ERISA requires an employee benefit plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133(1) (emphasis added).  The relevant regulations require that the notification "set forth, in a manner calculated to be understood by the claimant" "[t]he specific reason or reasons for the adverse determination," "the specific plan provisions on which the determination is based," and a description of the plan's review procedures, deadlines, and claimant's right to bring a civil action.  29 C.F.R. § 2560.503-1(g)(1).  The

purpose of these requirements is to "provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." Juliano v. Health Maint. Org. of NJ, 221 F.3d 279, 287 (2d Cir. 2000) (internal quotation marks omitted).

Plaintiff contends that the Initial Denial Letter failed to comply with ERISA and applicable regulations because it gave the following as the only stated reason for denial: "Mr. Mohamed was discharged for 'cause' by the Company, as defined in the Plan. . . . and he is thus ineligible to receive separation pay under the Plan." (Exh. 26 at A0073-74.) The Court agrees. The Plan's definition of 'cause' includes nine subparagraphs delineating circumstances that will be considered cause, including the catch-all "other circumstances as determined in the sole discretion of the Plan Administrator." (Plan § 2, Exh. 26 at A0036.) Yet the Initial Denial Letter makes no reference to which subparagraph is being invoked, much less to the facts the Committee believed amounted to the requisite circumstances.[13] See 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii) (requiring that a decision refer to the specific reasons for the adverse determination and the specific plan provisions); Wiener v. Health Net of Conn., Inc., 311 Fed. Appx. 438, 441 (2d Cir.

---

[13] The Initial Denial Letter does provide a description of the plan's review procedures and the time limits applicable to such procedures, as required by the regulations. See 29 C.F.R. § 2560.503-1(g)(1)(iv).

27

Conn. 2009) (ruling that "[t]he conclusory assertion that [a type of therapy] was not 'medically necessary' was insufficient to deny . . . claim") (citing C.F.R. § 2560.503-1(g)). Such notice was insufficient to provide Plaintiff with "enough information to prepare adequately for further administrative review." Juliano, 221 F.3d at 287. This failure was particularly troublesome because Defendants knew that Plaintiff did not understand the reason for his termination: Plaintiff testified that he believed that the sole reason he had been terminated was because he had purchased equipment without his manager's approval (Mohamed Dep. 197:3-13, Aug. 10, 2006.), yet French stated that Plaintiff's understanding was inaccurate but she refused to correct it. (Exh. 22.) Because "the articulation of a reason or reasons is too much a core component of ERISA's purpose and basic requirements to be dispensed with," Karce v. Bldg. Svc. 32B-J Pension Fund, No. 05 Civ. 9142, 2006 WL 3095962, at *8 (S.D.N.Y. 2006), this failure is significant.

Plaintiff also contends that the Appeal Denial Letter violated the regulations because it contained information never seen by the Committee and it referred repeatedly to information not conveyed to Plaintiff, such as references to: "highlights of the investigation"; "[t]hese actions and others not detailed herein"; and "[t]he bulk of his violations." (Exh. 26 at A0248-50.) As described earlier, this letter was far more

28

comprehensive than the Initial Denial Letter.  It referred to
specific sub-sections of the Plan's definition of "cause"--
stating that Plaintiff was terminated for violating the Code of
Business Conduct and Company policy--and recited evidence in
support of its conclusion.  It thus provided some of the
"specific reasons" for the denial.  See 29 C.F.R. § 2560.503-
1(g)(1)(i).  Still, the references to information not conveyed
to Plaintiff are problematic, particularly the assertion that
"[t]hese actions and others not detailed herein violate the
[sic] not only the PPA and Purchasing Policy but the Company's
Code of Business Conduct" and therefore fall within the
definition of "cause."  (Exh. 26 at A0249 (emphasis added).)
This sentence conveys that Plaintiff took other actions besides
those listed that violated Company policies, but Plaintiff is
left with no guidance as to what those alleged actions were.
Therefore, the Appeal Denial Letter, while not as inadequate as
the Initial Denial Letter, nevertheless could not provide
Plaintiff with "enough information to prepare adequately for . .
. an appeal to the federal courts."  Juliano, 221 F.3d at 287
(2d Cir. 2000) (internal quotation marks omitted).  As such,
both the Initial Denial Letter and the Appeal Denial Letter
failed to comply with 29 U.S.C. § 1133(1) and applicable
regulations.

(iii)   Plaintiff next asserts that the Committee failed to provide the evidence it relied upon in its initial denial to Plaintiff.   To satisfy the statutory requirement of a "full and fair review," when reviewing Plaintiff's appeal, the Committee was required to provide "all documents, records, and other information relevant to the claimant's claim for benefits."   29 C.F.R. § 2560.503-1(h)(2)(iii).   Under the regulations, a document, record or other information is be considered "relevant" if it: was relied upon in making the benefit determination; "[w]as submitted, considered, or generated in the course of making the benefit determination," even if it was not relied upon; or "[d]emonstrates compliance with the administrative processes and safeguards required [by the regulations]."   29 C.F.R. § 2560.503-1(m)(8)(i)-(iii).

It is undisputed that, despite the written request of Plaintiff's attorney for documents relevant to Plaintiff's claim, except for the Plan itself Defendants did not provide Plaintiff with any of the evidence upon which they relied until litigation.   (Def's. Rule 56.1 Stmt. ¶ 106; Pl.'s Rule 56.1 Stmt. ¶ 107.)   This evidence included copies of the policies Plaintiff was alleged to have violated, which were certainly relevant to the Committee's decision that Plaintiff had been fired for "cause."   Moreover, documents such as Plaintiff's performance evaluations and discipline, documents relating to

his purchases, and e-mails sent to Plaintiff from Kalan were documents that Plaintiff had seen or remembered generally, but Plaintiff did not have the detailed familiarity with them that was required to prosecute his claim. (Pl.'s Rule 56.1 Stmt. ¶ 104.)[14] Defendants' argument that they properly compiled an administrative record and produced it to Plaintiff during litigation misses the mark. The issue is that these documents were not disclosed to Plaintiff during the benefit review process. Plaintiff was therefore unable to correct the record, point out errors or omissions, or otherwise support his case on appeal. Accordingly, the Court concludes that the Committee violated applicable ERISA regulations when it failed to provide the required documents in its denial of Plaintiff's benefits. Cf. Russo v. Cont'l Cas. Co., No. 05 Civ. 5700, 2006 U.S. Dist. LEXIS 17963, *14 (S.D.N.Y. Apr. 11, 2006) (finding compliance with regulations where plaintiff requested a complete copy of his claim file and a copy was sent to plaintiff).

(iv) Plaintiff next asserts that the Committee unlawfully delegated its fiduciary authority by instructing employees Dew and French and contract attorney White to review his claim. Reviewing a claim for benefits is a fiduciary function. See 29 U.S.C. § 1133 (entitling claimant to "a full and fair review by

---

[14] In any event, these documents were still required to be provided under the regulations.

the appropriate named fiduciary) (emphasis added). "As ERISA
makes clear, and [as] the Second Circuit has affirmed, a plan
fiduciary is specifically charged with providing a full and fair
review of the claims brought, and it is improper to abdicate
that responsibility by simply relying on the opinions of
others." Neely v. Pension Trust Fund of the Pension,
Hospitalization & Benefit Plan of the Elec. Indus., No. 00 CV
2013, 2003 WL 21143078, *9 (E.D.N.Y. Jan. 16, 2003). "[T]he
degree to which a trustee may rely on [an] agent to make
decisions and take action without personal investigation . . .
depends on what is reasonable and appropriate under the
circumstances." Arnone v. CA, Inc., No. 08 Civ. 4458, 2009 WL
362304, *5 (S.D.N.Y. 2009) (internal quotation marks omitted).
Also, while a trustee may "delegat[e] to a subordinate the task
of fact-finding or the responsibility to respond to requests for
documents," in such circumstances the delegatee assumes a
fiduciary duty to the claimant to ensure "that the correct
benefits determination was made [and] to serve as judge rather
than prosecutor." Id. at *7 (emphasis in original).

Plaintiff claims that the Committee unlawfully delegated
its fiduciary authority by instructing employees Dew and French
and contract attorney White to review his benefits claim.
Specifically, Plaintiff asserts, White made both the initial
determination and the decision on appeal, and in both cases

relied for her facts on Dew and French, who were involved in the decision to fire Plaintiff. Plaintiff further argues that Defendants do not claim, and no evidence indicates, that the Committee ever saw a single document relating to Plaintiff in the course of the initial denial of his claim--not his written requests for benefits nor the policies Plaintiff was alleged to have violated. Defendants respond that facilitating or assisting in the review process is not the same as determining whether to deny a claim for benefits; it is undisputed that the Committee, not Dew, French or White, decided to deny Plaintiff's claim.

The Court finds that although the Committee relied heavily on the investigation of non-fiduciaries, the undisputed facts show that as a matter of law it did not unlawfully delegate its fiduciary authority to Dew, French and White. At the meeting in late May of 2005 during which the decision was made to deny Plaintiff's severance claim, Dew, a non-fiduciary, explained to the Committee that Plaintiff had been terminated after an investigation by Human Resources because he made unauthorized purchases of equipment and diverted the shipments to his home. (Def's. Rule 56.1 Stmt. ¶ 106; Pl.'s Rule 56.1 Stmt. ¶ 107.) To be sure, there is no evidence that the Committee asked Dew any questions about the investigation or heard from anyone other than Dew. And Donnelly testified that the Committee considered

no documents concerning Plaintiff's claim during the meeting.
(Donnelly Dep. 59:7-15, Sept. 27, 2006.)   Nevertheless, in the
context of a merger in which the Committee was reviewing
numerous claims for severance benefits,[15] the Court cannot
conclude that it was unreasonable for the Committee to rely on
the investigation of non-fiduciaries.   See Arnone, 2009 WL
362304, at *5-7 (explaining that it is permissible to
"delegat[e] to a subordinate the task of fact-finding" if it is
"reasonable and appropriate under the circumstances").   Although
the White Memo omitted reference to evidence or arguments in
Plaintiff's favor, as discussed immediately below this goes less
to improper delegation than to whether the Committee (or White,
who assumed a fiduciary duty to Plaintiff as well) improperly
"cherry-picked" the evidence.   For these reasons, the Court
concludes that the Committee did not unlawfully delegate its
fiduciary authority to Dew, French or White.

     (v)   Next, Plaintiff asserts that the Committee, Dew,
French and White "cherry-picked" the evidence.   "In exercising
its discretion, an administrator may weigh competing evidence
but it may not 'cherry-pick' the evidence it prefers while
ignoring significant evidence to the contrary."   Anderson v.
Sotheby's, Inc., 04 Civ. 8180, 2006 WL 1722576, *15 (S.D.N.Y.

---

[15] The total payments made to employees under the Plan in 2004 and 2005
exceeded $14 million.   (Def's. Rule 56.1 Stmt. ¶ 22; Pl.'s Rule 56.1 Stmt. ¶
22.

34

2006). This is because, on appeal, the administrator must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim . . . ." 29 C.F.R. § 2560.503-1(h)(2)(iv) (emphasis added).

As described above, when a fiduciary delegates to a subordinate the task of fact-finding, the subordinate assumes a fiduciary duty to the claimant to ensure "that the correct benefits determination was made [and] to serve as judge rather than prosecutor." Arnone, 2009 WL 362304, at *5. Here, undisputed evidence shows that Dew and White indeed "cherry-picked" the evidence in advance so that the Committee never saw evidence in Plaintiff's favor. In denying Plaintiff's initial request, it is undisputed that the Committee considered no evidence other than Dew's oral summary, and Defendants do not claim that Dew summarized any evidence in Plaintiff's favor. On appeal, the information selected for the Committee's review was contained in the one-page White Memo, which summarized the results of the Human Resources investigation and concluded that Plaintiff had acted without authorization. But the White Memo included no evidence or arguments in Plaintiff's favor, such as Plaintiff's claim that he had full authority to make such purchases without management approval for two years. The White Memo referred to Plaintiff's asking for permission to take equipment home on other occasions, but omits his explanation

35

that he did so because that was the process for equipment already in the Company's inventory, not for equipment like the Contested Equipment.

In addition, because it is undisputed that the Committee considered no documents other than the White Memo, the Committee never saw Plaintiff's Appeal Letter, which argued that "company records demonstrate that he had full authority to make hardware purchases and had been doing so for two years with management's knowledge." (Exh. 26 at A0106.) Had the Committee done so, it might have reviewed purchasing documents that were available to it to verify these claims. Similarly, no evidence indicates that the Committee saw the Appeal Denial Letter, which Donnelly sent to Plaintiff after the Committee voted to deny his appeal. It is telling that the Appeal Denial Letter discusses several arguments that had been raised in Plaintiff's Appeal Letter. It stands to reason that if certain topics were important enough to be discussed in the Appeal Denial Letter, Plaintiff's Appeal Letter, which addressed those topics, should have been before the Committee. Thus, French and White, who had assumed a fiduciary duty to Plaintiff to act as a judge and not a prosecutor, "cherry-picked" the evidence, ignoring significant evidence to the contrary.

Defendants contend that "[t]he Committee thoroughly considered all evidence presented by Plaintiff as well as by Ms.

36

French, Ms. White and Ms. Dew and did not ignore significant evidence in Plaintiff's favor." (Defs.' Mem. of Law in Reply to Pl.'s Opp. to Defs.' Motion for Summ. Judg. 15)   However, Defendants cite to no record evidence in support of this proposition.   Nor could they, because the undisputed evidence shows that the Committee considered only statements by White, and White's summary included no reference to evidence or arguments in Plaintiff's favor.   Defendants also respond that the evidence Plaintiff sought to present was "largely irrelevant" to the issue of whether he was terminated for 'cause,'" as the evidence goes to whether Plaintiff's unauthorized purchases were justified, not whether Plaintiff acted with authority in the first place.   However, as discussed in greater detail below, while Kalan, Van Akin, and French concluded that Plaintiff violated Company policy and should be terminated for "cause" notwithstanding Plaintiff's defense that on multiple occasions he had taken networking equipment home and exceeded his purchasing limitation without incident, the Committee was not required to agree.

(vi)  Next, Plaintiff asserts that the Committee operated under a conflict of interest.   The Court has already determined that the Committee did operate under a conflict of interest because it was the Plan administrator and the benefits payor. The Court therefore reviews the administrator's decision under

the arbitrary and capricious standard described above, keeping in mind that this conflict is a factor in determining whether the Committee abused its discretion in denying Plaintiff's claim. See First Reliance Std. Life Ins. Co., 2009 U.S. Dist. LEXIS 82306, at \*11. Specifically, such a conflict of interest may "act as a tie-breaker when the other factors are closely balanced." Glenn, 128 S.Ct. at 2351. It may weigh more heavily "where circumstances suggest a higher likelihood that it affected the benefits decision" but will "prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances . . . ." Id. Defendants adduce no evidence to indicate that they took such active steps to reduce potential bias and to promote accuracy. Accordingly, in deciding whether Defendants abused their discretion, the Court attributes some weight to the fact that the Committee was conflicted.

(vii) Finally, Plaintiff contends that Defendants failed to consult an expert about networking hardware, contrary to their "affirmative duty to seek expert advice when required." Miller v. United Welfare Fund, 72 F.3d 1066, 1073 (2d Cir. 1995). Plaintiff argues that because French admitted that she did not understand Plaintiff's drawing of what she believed to

38

be a "test lab," Defendants should have consulted an expert who could confirm or deny their suspicions. Defendants respond that because Plaintiff's termination for "cause" was based on his unauthorized purchases and shipments to his home, not his purported justifications for the use of the Contested Equipment, Human Resources experts and legal counsel--the individuals who investigated Plaintiff's conduct--were qualified to undertake such an investigation. Because the Court has already identified numerous other significant procedural shortcomings, it need not address this issue.

In all, the Court finds that although the Committee did not unlawfully delegate its fiduciary authority, it failed to decide Plaintiff's claim within 90 days, it failed to provide adequate notice of the specific reasons for denial, it failed to provide the evidence upon which it relied in its initial denial to Plaintiff, its delegatees "cherry-picked" evidence, and it operated under a conflict of interest. These procedural flaws violated Plaintiff's right to a "full and fair review" of his benefits claim as a matter of law.[16]

\* \* \*

---

[16] The Court notes that it appears to remain an open question in the Second Circuit whether substantial compliance with ERISA's procedural obligations will suffice. See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 107 (2d Cir. 2006) (stating that application of "substantial compliance" standard "would render the plain language of [the regulations] a nullity," but noting that "many of our sister courts of appeal . . . have held that a plan administrator's decision made in substantial compliance with the regulation can be upheld"). As is evident from this Opinion, Defendants' compliance with ERISA's requirements was well short of substantial.

"A full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review." Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 630 (2d Cir. 2008). There is an exception when "no new evidence could produce a reasonable decision permitting denial of the claim or remand would otherwise be a useless formality." Cohen v. Metropolitan Life Ins. Co., 485 F. Supp. 2d 339 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). Thus, when "the relevant information has been finally disclosed" and a court is "confident that administrative remand would be futile," remand is unnecessary. Krauss, 17 F.3d at 630.

The Court has found that Dew and White improperly "cherry-picked" the evidence in advance, so that the Committee never saw evidence in Plaintiff's favor. Defendants claim that the evidence Plaintiff sought to present to the Committee was "largely irrelevant" to the issue of whether he was terminated for 'cause,'" as this evidence goes to whether Plaintiff's unauthorized purchases were justified, not whether Plaintiff acted with authority initially. According to Defendants, Plaintiff mistakenly attempts to use his prior unauthorized purchases in 2003 to justify his misconduct in 2004: "Plaintiff's conduct was just as improper in 2003 as in 2004, even if he managed to avoid getting caught." ((Defs.' Mem. of

40

Law in Reply to Pl.'s Opp. to Defs.' Motion for Summ. Judg. 8 n.2.)

That may be, but the Committee was never given the chance to consider this argument.  While Kalan, Van Akin, and French concluded that Plaintiff violated Company policy and should be terminated for "cause" notwithstanding Plaintiff's claim that on multiple occasions he had taken networking equipment home and exceeded his purchasing limitation without question, the Committee was not required to agree with them.  Defendants do not claim that the Committee's role was simply to ask Human Resources to report to the Committee whether Plaintiff had or had not been fired for "cause," as Human Resources defined it. Rather, as the Plan administrator charged with deciding whether Plaintiff was entitled to severance benefits, the Committee had an independent obligation to determine whether Plaintiff's conduct fell within the Plan's definition of "cause"-- i.e., whether Plaintiff violated the Company Code of Business Conduct or another Company policy.

Therefore, remand would not be futile because a proper review process will allow the Committee to determine for itself whether Plaintiff's termination was for "cause."  For example, the Committee will be able to evaluate Plaintiff's claim that company records demonstrate that he had full authority to make

41

hardware purchases and had been doing so for two years with management's knowledge.

For these reasons, Defendants' denial of Plaintiff's benefits claim was arbitrary and capricious because the review process was fatally flawed. Accordingly, Plaintiff's claim that Defendants denied him benefits to which he is entitled in violation of ERISA is REMANDED to the Committee for reevaluation in compliance with ERISA and applicable regulations.

## 2. Retaliatory Termination

Plaintiff claims that by terminating him on January 27, 2005, the Company interfered with Plaintiff's rights by discriminating against him because he exercised his right to benefits, in violation of section 510 of ERISA, 29 U.S.C. § 1140. Defendants move for summary judgment on this claim, arguing that the Company had a legitimate, non-discriminatory reason for terminating Plaintiff's employment and there is no evidence that this reason was pretextual. Plaintiff opposes Defendants' motion for summary judgment but does not cross-move for summary judgment.

Section 510 of ERISA makes it unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right . . . for the purpose of interfering with the attainment of any

42

right to which such participant may become entitled under [an employee benefit] plan." 29 U.S.C. § 1140. "An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to" interfere with plaintiff's ERISA rights. Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988). There is no cause of action "where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." Id. Plaintiff must demonstrate the employer's "unlawful purpose in firing him." Id.

Because the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) presumptions and shifting burdens of production apply in the context of section 510 discriminatory discharge claims, see Dister, 859 F.2d at 1112, a plaintiff establishes a prima facie case of discrimination by showing that he (1) belongs to a protected group, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. See id. at 1114-15. If the plaintiff establishes a prima facie case, "a presumption arises that the employer unlawfully discriminated against the employee," and the employer must then "articulate--but not prove--a legitimate, nondiscriminatory reason for the discharge." Id. at 1112, 1115. If the employer does so, Plaintiff must adduce evidence which, "at a minimum[,] create[s] a genuine issue of fact as to

43

[defendant's] offered reasons or as to a discriminatory motive," i.e., that the reason advanced is "unworthy of credence." Id. at 1113, 1115.

Defendants assume for purposes of summary judgment that Plaintiff can establish a prima facie case but argue that the Company had a legitimate, non-pretextual reason for terminating Plaintiff's employment: Plaintiff failed to comply with the PPA Policy and shipped equipment to his home without his supervisor's permission. Defendants further maintain that this reason was not "unworthy of credence" or pretextual because Plaintiff admits engaging in the conduct for which he was terminated; the $85,000 in benefits Plaintiff sought was a mere "drop in the bucket" compared to the $14 million paid out under the Plan in 2004 and 2005; and Plaintiff fails to point to any evidence that the Company had the specific intent to interfere with Plaintiff's ERISA rights.

The Court finds that Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's discharge: Plaintiff's alleged violation of the PPA Policy and shipping of the Contested Equipment to his home without management approval. Indeed, Plaintiff concedes for purposes of Defendants' motion that Defendants' proffered reason--"that he embezzled money and stole equipment--would be a legitimate, nondiscriminatory basis for firing him." (Pl.'s Mem. of Law in Support of Pl.'s Motion

for Partial Summ. Judg. and in Opp. to Defs.' Motion for Summ.
Judg. 41.) And while Plaintiff argues that Defendants have not
established that such is the only reasonable conclusion on the
record, (Pl.'s Mem. of Law in Support of Pl.'s Motion for
Partial Summ. Judg. and in Opp. to Defs.' Motion for Summ. Judg.
41,) the employer need only "articulate--but not prove--a
legitimate, nondiscriminatory reason for the discharge."
Dister, 859 F.2d at 1115 (emphasis added).

In addition, the Court agrees with Defendants that
Plaintiff has not adduced evidence that creates a genuine issue
of fact as to whether Defendant's proffered reason is unworthy
of credence and pretextual. Plaintiff theorizes that "a
reasonable factfinder could conclude that Kalan and Van Akin,
angry at Mohamed's refusal to accept the Bridgewater position,
trumped up an 'investigation' into what was in fact a routine
purchasing practice for Mohamed, discharging him for 'cause'
less than two weeks before his scheduled layoff in order to deny
him severance benefits." (Id.) However, Plaintiff's evidence
does not support this theory. Plaintiff points out that no
other member of Van Akin's group who was offered a position in
the new organization declined it and that Van Akin asked
Plaintiff three times to accept the position and was angry when
Plaintiff refused. (Id. at 42.) As evidence of Van Akin's
supposed anger, Plaintiff relies on Van Akin's deposition

45

testimony that "I conveyed to [Plaintiff] that I would love to have him on my team" and, when Plaintiff refused, Van Akin asked Plaintiff: "[I]s there anything we can do to convince you this would be a good position for you?"   (Pl.'s Rule 56.1 Stmt. ¶ 150.)   This testimony hardly suggests Van Akin was upset with Plaintiff.   In fact, it indicates that Van Akin was keen on keeping Plaintiff on his team.   Also, Plaintiff conveniently omits Van Akin's testimony that the conversation was "pleasant" and "mutually respectful of each other's position."   (Van Akin Dep. 78:25-79:6, Sept. 22, 2006.)

To contest Van Akin's testimony, Plaintiff relies on his own word that Akin was "angry."   See (French Dep. 124, Sept. 26, 2006 (recounting how Plaintiff stated to French that Van Akin was angry with him for not accepting the offered position).)   However, a party responding to a motion for summary judgment supported by affidavits must present specific evidence in support of his contention that there is a genuine dispute as to a material fact in the case.   See St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000).   Conclusory statements, mere conjecture, hearsay or speculation by the party resisting summary judgment cannot defeat the motion.   Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999).   Here, Plaintiff fails to present anything but speculative, self-serving conclusions in support of his theory that Kalan and Van

Akin, angered by his refusal to accept the new position, discharged Plaintiff based on a trumped up investigation all in order to deny him severance benefits. Plaintiff cannot defeat summary judgment on that basis.

The Court also notes that Defendants did not stand to reap substantial cost savings by withholding $85,000 in severance benefits from Plaintiff in light of the $14 million paid out under the Plan in 2004 and 2005. Plaintiff asserts that "a reasonable factfinder could just as easily conclude that a company facing heavy severance payments following a merger would be especially motivated to find ways not to pay benefits." (Pl.'s Mem. of Law in Support of Pl.'s Motion for Partial Summ. Judg. and in Opp. to Defs.' Motion for Summ. Judg. 42.) But in deciding ERISA section 510 claims, courts in this district consider as one factor whether an employer would save substantial amounts of money by terminating an employee. See, e.g., Dister, 859 F.2d at 1115 (finding circumstances that give rise to an inference of discrimination where plaintiff presented evidence of substantial cost savings to employer--approximately $550,000); Duffy v. Drake Beam Morin, No. 96 Civ. 5606, 1998 WL 252063, at *10 (S.D.N.Y. May 19, 1998) ("Nor is there evidence that [defendants] . . . stood to reap substantial cost savings by firing plaintiffs.").

47

Finally, although the Court has determined that there were significant procedural flaws that violated Plaintiff's right to a "full and fair review" of his benefits claim, there is no evidence that Defendants were at least in part motivated by the specific intent to interfere with Plaintiff's ERISA rights.

For these reasons, Plaintiff has failed to adduce evidence that creates a genuine issue of fact as to whether Defendant's proffered reason for Plaintiff's termination is pretextual. Accordingly, Defendants' motion for summary judgment on this claim is GRANTED.

### 3. Demand for Plan and Other Relevant Documents

Plaintiff claims that the Committee[17] violated ERISA section 502(c)(1), 29 U.S.C. § 1132(c)(1), by delaying in providing him with (a) a copy of the Plan by two weeks and (b) documents relevant to his claim by a year. As for (a), Defendants argue that they provided the Plan to Plaintiff just three days after his March 21, 2005 request. Plaintiff responds that Defendants' mailroom received Plaintiff's letter requesting a copy of the Plan on February 10, 2008 but did not send the Plan to Plaintiff until March 24, 2005, 12 days after the 30-day deadline. As for (b), the twelve categories of documents requested in Plaintiff's

---

[17] This claim is asserted only against the Committee. (Pl.'s Mem. of Law in Support of Pl.'s Motion for Partial Summ. Judg. and in Opp. to Defs.' Motion for Summ. Judg. 35 n.4.)

July 14, 2005 letter, Defendants contend that none of these
documents is required to be provided under ERISA.   Plaintiff
responds that applicable regulations require plan administrators
to provide information "relevant to the claimant's claim for
benefits," including documents that were "relied upon,"
"submitted, considered, or generated in the course of making the
benefit determination."   29 C.F.R. § 2560.503-1(h)(2)(iii),
(m)(8).   Both sides move for summary judgment on this issue.

Regarding the Plan, section 104(b)(4) of ERISA requires
that the administrator "upon written request of any participant
or beneficiary, furnish a copy of the latest updated summary,
plan description . . . or other instruments under which the plan
is established or operated."   29 U.S.C. § 1024(b)(4).   The
administrator's failure or refusal "to comply with a request for
any information which such administrator is required by this
subchapter to furnish to a participant or beneficiary" by
mailing the requested material within 30 days of the request
"may in the court's discretion be personally liable to such
participant or beneficiary in the amount of up to $100 a day
from the date of such failure or refusal . . . ."   29 U.S.C. §
1132(c)(1).

It is undisputed that Plaintiff's letter requesting a copy
of the Plan was received in Defendants' mailroom in New York on
February 10, 2005 and that Defendants did not send the Plan to

49

Plaintiff until March 24, 2005, 12 days after the 30-day deadline. Defendants claim that Donnelly never received the letter because her office was being moved to the Company's new headquarters at the time and there was no mechanism in place for forwarding her mail. (Def's. Rule 56.1 Stmt. ¶¶ 84, 86.) However, the letter was sent to and received at the official address listed for the Plan administrator. Plaintiff can hardly be faulted for Defendants' failure to forward Donnelly's mail. Moreover, Defendants were apparently aware of the February 9, 2005 request date as two of Defendants' own documents contain notations reflecting that date. (Def. Exh. 26 at A0129, A0320.) Therefore, the Court finds that Defendants provided Plaintiff with a copy of the Plan 12 days after the statutory deadline.

As for the twelve categories of other documents, Defendants rely primarily on the Second Circuit's decision in Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139 (2d Cir. 1997), which held that ERISA's requirement that the administrator furnish the plan or "other instruments under which the plan is established or operated," 29 U.S.C. § 1024(b)(4) encompasses "only formal or legal documents under which a plan is set up or managed." Id. at 145 (internal quotation marks omitted). The Weinstein panel agreed with the Fourth Circuit that this requirement "is not sufficiently broad to require disclosure of any and all 'documents that would assist

participants and beneficiaries in determining their rights under a plan and in determining whether a plan is being properly administered.'" Id. (quoting Faircloth v. Lundy Packing Co., 91 F.3d 648, 653 (4th Cir. 1996)). Defendants reason that under Weinstein, the requested documents--which related to Plaintiff's equipment purchase, job evaluations and other documents generated in the course of his employment—need not be provided.

However, Plaintiff is not claiming that the twelve categories of documents fall within statutory phrase "other instruments," the phrase which Weinstein construed. Rather, Plaintiff relies on alleged violations of ERISA regulations which impose broader duties on plan administrators. Plaintiff points to the regulatory requirement that plan administrators must provide information "relevant to the claimant's claim for benefits," which includes documents that were "relied upon," "submitted, considered, or generated in the course of making the benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iii), (m)(8).

This raises the question of whether statutory penalties may be assessed against a plan administrator under 29 U.S.C. § 1132(c)(1) for violations of ERISA's implementing regulations. Plaintiff points to no case imposing such penalties in such circumstances. Instead, Plaintiff argues that the statute provides that the claims procedure must be administered "[i]n

51

accordance with regulations of the Secretary [of Labor]," 29
U.S.C. § 1133, and that the statute further authorizes the
Secretary to "prescribe such regulations as he finds necessary
or appropriate to carry out the provisions of this subchapter,"
29 U.S.C. § 1135.   Therefore, Plaintiff reasons, Defendants'
violation of the regulatory requirement to provide documents
that were relied upon, submitted, considered or generated in the
course of the benefit determination is a failure to provide
information "required by this subchapter," punishable by fines.
29 U.S.C. § 1132(c)(1).

     In Anderson v. Sotheby's Inc. Severance Plan, No. 04 Civ.
8180, 2005 WL 1309056 (S.D.N.Y. May 31, 2005), the court agreed
with the Third and Seventh Circuits that statutory penalties may
not be assessed against the Plan Administrator under 29 U.S.C. §
1132(c)(1) for violations of ERISA's implementing regulations.
Id. at *3; see Wilczynski v. Lumbermens Mut. Cas. Co., 93 F.3d
397 (7th Cir. 1996) (holding that because "the obligations of
[29 U.S.C.] section 1133 [to carry out claims procedures in
accordance with regulations] are imposed only on benefit "plans"
and "[29 U.S.C.] § 1132(c) authorizes the imposition of
sanctions only for the failures or refusals of the 'plan
administrator,' and not those of the 'plan,'" "section 1132(c)
cannot be used to impose civil liability for the violation of
section 1133"); Groves v. Modified Retirement Plan, 803 F.2d

52

109, 113 (3d Cir. 1986) ("[B]ecause § 502(c) authorizes

sanctions only for failure to perform duties imposed by 'this

subchapter,' we hold that sanctions may not be imposed on a plan

administrator for his failure to fulfill obligations imposed

only by regulations promulgated pursuant to ERISA.  Thus while

[29 C.F.R. § 2560.503-1(f)] does impose duties on plan

administrators, we believe that [29 U.S.C. § 1132(c)(1)]

sanctions are not available for failure to fulfill those

duties.".).  Like the Anderson court, "[g]iven the express

wording of section 1132 and the judicial interpretations found

in Groves and Wilczynski," this Court concludes "that a

violation of ERISA's implementing regulations cannot support the

imposition of sanctions under section 1132 . . . ."  Anderson,

2005 WL 1309056, at *4.

     Therefore, the undisputed facts show that Defendants may be

sanctioned only for failing to provide Plaintiff with a copy of

the Plan within the 30-day statutory period.

     "The imposition of penalties for violating ERISA §

104(b)(4) is left to the discretion of the district court. . . .

Awards of penalties and their amounts depend on the following:

(1) the administrator's bad faith or intentional conduct; (2)

the length of the delay; (3) the number of requests made; (4)

the extent and importance of the documents withheld; and (5) the

existence of any prejudice to the participant or beneficiary."

53

McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund, 320
F.3d 151, 163 (2d Cir. 2003). Given the $100 per day statutory
maximum, the highest possible penalty here is $1,200. In light
of Plaintiff's multiple requests for the Plan and the importance
of the Plan itself to Plaintiff's claim for benefits, this Court
finds that an award of a $1,200 penalty against the Committee is
warranted. The Court also notes that there are indications of
bad faith or intentional conduct inasmuch as there are notations
on Defendants' internal documents noting the February 9, 2005
claim date. (See supra n.8.)

Accordingly, Plaintiff's motion for summary judgment on his
claim that the Committee violated ERISA section 502(c)(1), 29
U.S.C. § 1132(c)(1), is GRANTED, and the Court awards a penalty
of $1,200 against the Committee to Plaintiff.

### 4. Retaliatory Counterclaims

Plaintiff claims that the counterclaims filed by Defendants
in this action violate section 510 of ERISA, 29 U.S.C. § 1140,
because they amount to unlawful retaliation for Plaintiff's
filing of the Complaint to assert his entitlement to ERISA
benefits. Defendants move for summary judgment on this claim

and Plaintiff cross-moves for summary judgment as against the Company.[18]

"To make out a prima facie case of retaliation under § 510, [plaintiff] must show that (1) he was engaged in a protected activity, (2) [defendant] was aware of that activity, (3) he suffered from an adverse employment decision and (4) there was a causal connection between the protected activity and the adverse employment action." Giordano v. Thomson, 564 F.3d 163 (2d Cir. 2009). As for (3), "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Furthermore, as discussed above, plaintiff must offer evidence showing that defendant had the specific intent to interfere with the plaintiff's protected rights. See Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988).

Defendants argue that Plaintiff has not suffered any type of adverse action that is cognizable under Section 510 because an employer's counterclaim filed after a plaintiff was terminated cannot constitute retaliation under ERISA as a matter

[18] Plaintiff reserves his right to argue at trial that the Plan and Committee are liable for retaliation because they participated in causing the Company to assert the counterclaims. (Pl.'s Mem. of Law in Support of Pl.'s Motion for Partial Summ. Judg. and in Opp. to Defs.' Motion for Summ. Judg. 43 n.8.)

of law.  Noting that the Second Circuit has not yet decided this issue, see Spiegel v. Schulmann, No. 03 Civ. 5088, 2006 WL 3483922, at *58 (E.D.N.Y. Nov. 30, 2006), Defendants cite to out-of-circuit decisions which hold that an employer's counterclaim is not actionable retaliation.  See Hernandez v. Crawford Bldg. Material Co., 321 F.3d 528 (5th Cir. 2003); Beltran v. Brentwood N. Healthcare Ctr., LLC, 426 F. Supp. 2d 827, 834 (N.D. Ill. 2006).  Defendants also point out that section 510 renders unlawful efforts "to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled" under a benefit plan, but it does not mention the filing of counterclaims or any other conduct occurring after termination.  Moreover, Defendants reason, filing a counterclaim will not chill plaintiffs from exercising and enforcing their rights because such plaintiffs will have necessarily initiated a lawsuit already.

Plaintiff relies on Kreinik v. Showbran Photo, Inc., 02 Civ. 1172, 2003 WL 22339268 (S.D.N.Y. Oct. 10, 2003) for the proposition that counterclaims filed by an ERISA defendant may constitute unlawful retaliation under section 510.  In addition, Plaintiff argues that the Supreme Court's decision in Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)-- which held that retaliation under Title VII "is not limited to

discriminatory actions that affect the terms and conditions of employment," id. at 64--means that counterclaims may amount to prohibited retaliation in the ERISA context if asserted for a retaliatory reason.

In Kreinik v. Showbran Photo, Inc., the court held that counterclaims by a former employer against a former employee may be actionable retaliation if the counterclaims "have a direct, adverse impact on [plaintiff's] present employment or future employment prospects." Kreinik, 2003 WL 22339268, at *19-24. Thus, counterclaims alleging, inter alia, that plaintiff infringed a trade name, committed unfair competition and tortiously interfered with prospective business relations could impact plaintiff's personal and professional reputation and therefore, could amount to a cognizable adverse effect. Id. at *25.

In Burlington Northern, the Supreme Court held that retaliation under Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment," but encompasses all conduct which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 64, 68 (internal quotation marks omitted). The Court emphasized the difference in Title VII's antidiscrimination provision--which uses words that "limit the scope of that provision to actions that affect employment or

alter the conditions of the workplace," such as "hire,"
"discharge," and "employment opportunities," id. at 62--and
Title VII's antiretaliation provision, which includes no such
words of limitation.  Id.  Furthermore, the Court observed, to
prevent workplace discrimination Congress only needed to
prohibit employment-related discrimination.  But to "prevent[]
an employer from interfering (through retaliation) with an
employee's efforts to secure or advance enforcement of the Act's
basic guarantees," Congress had to prohibit an employer from
"taking [retaliatory] actions not directly related to
[plaintiff's] employment," including actions that "caus[e
plaintiff] harm outside the workplace."  Id. at 63 (emphasis in
original).

In the wake of Burlington Northern, there is now a
"substantial question" as to the validity of precedent holding
that a post-termination lawsuit or counterclaim may not be an
adverse employment under section 510.  Spiegel v. Schulmann, No.
03 Civ. 5088, 2006 WL 3483922, at *58 (E.D.N.Y. Nov. 30, 2006).
One post-Burlington Northern case from this district has adhered
to Kreinik's requirement that a counterclaim have some impact on
the plaintiff's employment or prospective employment.  See Fehn
v. Group Long Term Disability Plan for Employees of JP Morgan
Chase Bank, 2008 U.S. Dist. LEXIS 50060, *6 (S.D.N.Y. June 30,
2008) (holding that plaintiff failed to allege how defendant's

Case 1:06-cv-01504-BSJ Document 45 Filed 12/22/09 Page 59 of 65

claim for restitution for moneys allegedly overpaid to plaintiff would have an actual or apparent adverse impact on plaintiff's prospective employment). Importantly, though, the Fehn court acknowledged that "the text of section 510 does not specifically state that the interference must be with an employment relationship." Id. at *6 n.2. Nevertheless, Fehn relied entirely on "previous case law that has addressed this issue." Id. at *6 (citing Devlin v. Transp. Commons Int'l Union, 1997 WL 570512, at *6 (S.D.N.Y. Sept. 15, 1997); Downes v. JP Morgan Chase & Co., 2004 WL 1277991, at *5 (S.D.N.Y. June 8, 2004); DeSimone v. Transprint USA, Inc., 1996 WL 209951, at *3 (S.D.N.Y. Apr. 29, 1996); DeGrooth v. Gen. Dynamics Corp., 837 F.Supp. 485, 489 (D. Conn. 1993)). The Court observes that this case law predates Burlington Northern, and nowhere does Fehn discuss or even cite that case.

In light of Burlington Northern, it would seem that retaliation under ERISA section 510 is not limited to discriminatory actions that affect the terms and conditions of employment. And it may be that counterclaims by a former employer in an ERISA suit can amount to a materially adverse action even if the counterclaims have no conceivable impact on the plaintiff's employment or prospective employment. Title VII's antiretaliation provision--which the Burlington Northern Court explained used words that were not limited to actions

affecting employment--states in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a) (emphasis added). Likewise, ERISA's antiretaliation provision makes it unlawful "to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled . . . ." 29 U.S.C. § 1140 (emphasis added). Defendants argue that the Court's reasoning in Burlington Northern should be confined to the Title VII context, but the Second Circuit has already applied that decision outside of Title VII. See Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199, 205 (2d Cir. 2006) (applying Burlington Northern to an ADEA claim because "[t]he ADEA contains a nearly identical provision [to Title VII] prohibiting retaliation for complaining of employment discrimination on the basis of age . . . and the same standards and burdens apply to claims under both statutes"). As with the ADEA, specific intent in an ERISA section 510 case "is determined under the burden-shifting framework" for Title VII cases outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Giordano v. Thomson, 564 F.3d 163, 169 (2d Cir. 2009). Based on the statutory text and these other

considerations, it would seem that the reasoning of Burlington
Northern applies in the Title VII context and counterclaims by a
former employer in an ERISA suit could amount to a materially
adverse action even if the counterclaims have no impact on the
plaintiff's employment or prospective employment. However, in
light of the Court's finding (below) that Plaintiff cannot show
that the Company's proffered reason for asserting the
counterclaims is actually a pretext for retaliation, the Court
need not decide this issue.

Defendants next argue that even if counterclaims can
constitute retaliation under ERISA section 510, it is undisputed
that Plaintiff has not suffered any adverse effect from the
Company's counterclaims here because he has already filed the
Complaint, is currently employed, and no longer asserts that the
counterclaims adversely affected his prospective employment.
However, as discussed, it appears that under Burlington Northern
Plaintiff need not show an effect on his current or prospective
employment. And the question is not whether this did dissuade
Plaintiff from pursuing his charge of discrimination--the
essence of a retaliation claim is that the employer took an
adverse action against an employee precisely because the
employee already had exercised his rights.

Nevertheless, the Court agrees with Defendants that, even
if Plaintiff has established a prima facie case of retaliation,

61

Plaintiff cannot show that the Company's proffered reason for asserting the counterclaims--that it had a reasonable good-faith belief that the claims were valid--is actually a pretext for retaliation. Plaintiff relies on the following evidence in support of his claim that the Company asserted the counterclaims at least in part in retaliation for Plaintiff's commencement of this lawsuit: the Company's claims could have been asserted earlier but defendants failed to take any action to assert them during the year and a half before the lawsuit was commenced, see Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 227 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protective activity was closely followed in time by the adverse action."); Defendants admit in their brief that, absent Plaintiff's suit, they "may not have opted to commence independent litigation" (Defs.' Mem. of Law in Support of Defs.' Motion for Summ. Judg. 24.); the Company failed to preserve the evidence of the alleged conversion and unjust enrichment, i.e., the Contested Equipment, suggesting the Company had no interest in asserting legal claims based on it at the time; and the Company has never taken a concrete step to sue a former employee for tuition reimbursement, other than Plaintiff.

However, it is undisputed that the Company had previously sought reimbursement for tuition assistance from former

employees: in 2003, the Company made demands of one employee for tuition reimbursement and, with respect to another employee, executed a settlement agreement stating that the Company waives any claim of tuition reimbursement it might have. (Def's. Rule 56.1 Stmt. ¶ 122; Pl.'s Rule 56.1 Stmt. ¶ 122.)  In addition, defendants did take action to assert the tuition reimbursement claim before the lawsuit commenced: during their January 27, 2005 call with Plaintiff, Kalan and French advised him that he would have to repay the tuition assistance.  (Id. ¶ 121.)  And French even prepared a letter to Plaintiff demanding repayment of his tuition--as Plaintiff requested--but the letter was never sent due to confusion over responsibilities during the merger. (Id. ¶ 124.)  Defendants' admission that they "may not have opted to commence independent litigation" in no way means that their decision to use the court system to efficiently assert the counterclaims once named in this lawsuit is "unworthy of credence."  Dister, 859 F.2d at 1113.

At bottom, Plaintiff has failed to offer evidence showing that Defendants had the specific intent to interfere with Plaintiff's protected rights.  Id. at 1111.  Accordingly, Defendants' motion for summary judgment on this claim is GRANTED, and Plaintiff's claim that the counterclaims violate section 510 of ERISA is DISMISSED.

## 5. Counterclaims

In their counterclaims, Defendants allege that Plaintiff breached his tuition assistance contract, converted Defendants' monetary property, and was unjustly enriched. (Defendants' Answer, Affirm. Defenses and Counterclaims ¶¶ 1-27.) Defendants move for summary judgment on these counterclaims. Plaintiff moves for judgment as a matter of law for failure to state a claim, or, in the alternative, summary judgment.

The Court finds that Defendants have stated a claim with respect to their counterclaims. Accordingly, Plaintiff's motion for judgment as a matter of law on the counterclaims is DENIED. However, because there are genuine issues as to material facts with respect to each counterclaim, Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment on these counterclaims are DENIED.

### CONCLUSION

For the reasons set forth above, (1) Plaintiff's claim that Defendants denied him benefits to which he is entitled in violation of ERISA is REMANDED to the Committee; (2) Plaintiff's ERISA section 510 claim for retaliatory termination is DISMISSED; (3) Plaintiff's motion for summary judgment on his claim that the Committee violated ERISA section 502(c)(1) is GRANTED, and the Court awards a $1,200 penalty against the

Committee to Plaintiff; (4) Plaintiff's claim that Defendants'

counterclaims are retaliatory in violation of ERISA section 510

is DISMISSED; and (5) Plaintiff's motion for judgment as a

matter of law on Defendants' counterclaims is DENIED, and

Defendants' motion for summary judgment and Plaintiff's cross-

motion for summary judgment on the counterclaims are DENIED.


**SO ORDERED:**


Barbara S. Jones
**UNITED STATES DISTRICT JUDGE**


Dated:     New York, New York
           December 18, 2009